[No. 56430–2.   En Banc.   April 4, 1991.]

ROBERT W. HEMENWAY, ET AL, *Respondents,* v. MARGARET MILLER, ET AL, *Petitioners.*

*Breskin & Robbins* and *Arnold B. Robbins,* for petitioners.

*Robert A. Wolle,* for respondents.

BRACHTENBACH, J.—This is an action by the original makers of a promissory note who claim they became sureties by operation of law when a third party assumed the obligation to pay the note. The makers of the note allege that the payee of the note, their creditor, allowed the creditor's security interest in collateral to lapse, thereby impairing the makers' recourse to that collateral. The trial court granted partial summary judgment on the creditor's liability for impairment of collateral. Following trial on damages, the court held that the makers were entitled to partial discharge on the note in the amount of $32,724.36, the gross value of the collateral. The Court of Appeals affirmed. *Hemenway v. Miller,* 55 Wn. App. 86, 776 P.2d 710 (1989). We reverse.

In October 1980, the defendants, Margaret and Ken Miller,[1] sold a retail business to plaintiffs, Robert and Patricia Hemenway, who gave the sellers a $93,000 promissory note representing the unpaid purchase price. The note was secured by the inventory, equipment and goodwill of the business sold. The documents are dated October 15, 1980, but the security interest was not perfected until December 17, 1980. No reason for the delay appears in the record; we note that the buyers' attorney was the closing agent.

In June 1984, the original buyers, makers of the note, sold the business to third parties who assumed the original buyers' obligations, including the note. Clerk's Papers, at

---

[1]The sellers–creditors were Margaret Miller as her separate estate and her husband who joined as to his presumptive community interest. We refer to the sellers interchangeably as there is no issue relating to their status.

270. Perfection of the original security interest lapsed on or about December 17, 1985, for failure of the sellers–creditors to file a continuation statement, RCW 62A.9–403(2). In the meantime the third parties granted a security interest to a bank which obtained priority due to the lapse of perfection in the original security interest. The third parties then went bankrupt and the bank realized on its security interest.

We will refer to the original sellers who were payees on the note as the creditor, to the original buyers who were makers on the note as the maker or debtor or surety and to the second buyers who assumed the note as the assignee. The trial court held there were no genuine issues of material fact and the debtor was entitled to a partial discharge from the note as a matter of law. The legal theory was that when the assignee assumed the note the debtor became a surety by operation of law. The creditor then had a duty to not impair the surety's recourse to the collateral. When the creditor failed to file a continuation statement, it impaired the collateral, thus discharging the debtor to the extent of the value of the collateral. We hold that under the legal principles discussed hereafter there were genuine issues of material fact and the debtor was not entitled to judgment as a matter of law.

## I

The first question is whether the maker of the note became a surety by operation of law when the assignee contractually assumed the debt due the creditor. As between the maker and the assignee, the maker became a surety. A. Stearns, *Suretyship* § 2.3, at 10 (5th ed. 1951). *Fluke Capital & Mgt. Servs. Co. v. Richmond,* 106 Wn.2d 614, 621, 724 P.2d 356 (1986).

However, this conclusion does not answer the issue here. Does the maker–debtor assume the position of surety *as to the creditor* with the right to assert suretyship defenses? That *may be* the legal effect of an assumption of the debt, but only if (1) there is definite and specific notice to the creditor so that the creditor is fully apprised of his

changed relationship with the maker, and (2) the creditor consents to the assumption.

If the original obligor becomes a surety, the rights of the creditor are altered. It is elementary that the existing rights of the creditor cannot be altered to include new duties to the alleged surety unless the creditor has knowledge of the event which creates the suretyship. *Alaska Pac. Salmon Co. v. Matthewson*, 3 Wn.2d 560, 564, 101 P.2d 606 (1940) held that the fact that the creditor knew one partner was taking over the partnership operation from another partner did not provide the requisite knowledge that the taking–over partner was purchasing the other's interest. Thus, a suretyship relation was created between the partners, but not as to the creditor. *Accord, Moon Bros. Carriage Co. v. Devenish*, 42 Wash. 415, 418, 85 P. 17 (1906). The notice to the creditor must be actual notice. *Culbertson v. Wilcox*, 11 Wash. 522, 524, 39 P. 954 (1895). Thus, the notice must be of the fact of assumption, not merely notice of the transaction.

There is evidence in the record to indicate no such knowledge on the part of the creditor. The affidavit of the creditor–wife in the present case denies that the creditor knew of the assumption of the note by the assignee. When the next annual payment was due after the sale to the assignee, and not timely made, the creditor contacted the maker, not the assignee. More than a year later the creditor learned, for the first time according to her affidavit, that the annual payment had been made by the assignee. The collecting bank had unilaterally changed the name of the payor on the collection account to the assignee. Still a year later the assignee advised the creditor that it would not make the 1986 annual payment and that a bank had a security interest in the inventory. The creditors stated they had no interest in the inventory believing they had waived any interest when they consented to the sale.

When the 1986 payment was not made the creditors' attorney wrote the collecting bank advising it that the

*maker* was delinquent and that action was being commenced *against the maker*. At the same time the creditors' attorney wrote the *makers* accelerating payment according to the terms of the note. In response, the *makers'* attorney tendered payment *by the makers* upon condition of erasing the default and granting permission to sell the collateral and apply the net proceeds to the *makers'* debt to the creditor. Clerks's Papers, at 189.

In addition to actual knowledge, the creditor must consent to the alteration of the existing creditor's contractual rights, *i.e.*, the creditor must consent to the original obligor becoming a surety. This has been the law of this state for 100 years. In *Wadhams v. Page*, 1 Wash. 420, 423, 25 P. 462 (1890) the court dealt with a claim that one partner became a surety because the other partner assumed the partnership debt to the creditor. The court held: "If one partner transfers his liability to another and the creditor does not assent to the transfer, his rights are not affected." *McAreavy v. Magril*, 123 Iowa 605, 607, 99 N.W. 193, 194 (1904) expresses the principle that the debtors (or the debtor and another) cannot impose upon the creditor new or additional obligations arising from suretyship without the creditor's consent. Consent to assumption is required according to *La–Rey, Inc. v. Kowalski*, 433 S.W.2d 530, 533 (Tex. Civ. App. 1968). *See* E. Arnold, *Outlines of Suretyship and Guaranty* § 9, at 16 (1927).

In finding consent in this case, the trial court and the Court of Appeals relied principally upon *Smiley v. Wheeler*, 602 P.2d 209 (Okla. 1979). That case is distinguishable because the creditor there specifically agreed to the assumption of the debt. Whether there was such an agreement remains factually unresolved in this case.

In fact, there is considerable evidence to show lack of consent. Some 3½ years after the original sale by the creditor–seller to the debtor–buyer, the debtor asked the creditor to execute a "consent to assignment" to allow the debtor to sell the business to the assignee. Consent was required because the security agreement between maker–

debtor and payee–creditor required consent for a sale of the secured goods. The "consent to assignment" which the debtor originally sought to have the creditor sign referenced the applicable security agreement paragraph which required consent, but also gave consent to "transfer, assignment and assumption of the rights, duties and liabilities" under the contract of sale. It further provided that the creditors "expressly waive, surrender and release all rights against [maker]." Clerk's Papers, at 181. The creditor refused to sign this consent and told the maker that it (the creditor) would agree to the sale only if the maker remained liable for the note. The creditor then did sign a consent; a consent in which *there is no mention of the note or assumption of the note.* Moreover, the consent provided: "We expressly do not waive, surrender or release any monetary obligation due and owing by [makers] . . . with regard to our sale to them of that certain business. . . ." Clerk's Papers, at 183.

██ In determining whether summary judgment was properly granted based on the facts in the present case, we must draw all reasonable inferences in the light most favorable to the creditor, the nonmoving party. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). We initially note that the trial court entered findings of fact and conclusions of law in the order granting partial summary judgment. However, findings of fact on summary judgment are not proper, are superfluous, and are not considered by the appellate court. *Chelan Cy. Deputy Sheriffs' Ass'n v. Chelan Cy.,* 109 Wn.2d 282, 294 n.6, 745 P.2d 1 (1987).

Based on the previously recited facts from the record and ignoring the trial court's findings of fact, we cannot say that reasonable minds could reach but one conclusion in this case. The creditor rejected a consent which provided for assumption of the note by the assignee and release of the debtor. The consent which the creditor did sign, in contrast, does not mention the note or its assumption, but rather expressly refused to waive, surrender or release the

makers' obligation. Subsequent demands for payment were made to the makers, not the assignee. This conduct, these documents, and the denial by the creditor of knowledge or consent create genuine issues of fact as to the knowledge and consent requisite to the maker becoming a surety as to the creditor.

## II

Because the matter must be remanded for trial, at which time the debtor may be found a surety vis-a-vis the creditor, we consider the impairment of collateral issue. The debtor's argument on this issue is that it is a surety and as such has recourse to the collateral. When the creditor did not file a continuation statement for the collateral, the subsequent unperfection impaired the debtor's ability to have recourse against the collateral; *i.e.*, impaired the collateral. As a result, the debtor claims that under RCW 62A.3-606 it is discharged from liability to the creditor to the extent of the value of the collateral which the creditor impaired.

There is no doubt that the surety acquires, by operation of law, an interest in the property securing the primary debt and may have a right of recourse against the collateral. *National Bank of Wash. v. Equity Investors,* 86 Wn.2d 545, 556, 546 P.2d 440 (1976). While there are no Washington cases providing that failure to perfect or maintain perfection in a security interest is an impairment of collateral, we will assume that it is for purposes of resolving the questions presented to us by the parties in this appeal. *See* 1 J. White & R. Summers, *Uniform Commercial Code* § 13-15, at 666 & n.18 (3d ed. 1988). However, just because the collateral has been impaired does not mean that there will be a discharge under RCW 62A.3-606.

RCW 62A.3-606 provides in pertinent part:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
. . . .

(b) *unjustifiably* impairs any collateral for the instrument given by . . . the party . . . against whom he has a right of recourse.[2]

(Italics ours.) From this it appears that the creditor may have a duty to not impair the collateral, *i.e.,* not diminish the surety's recovery from the collateral. However this duty is not absolute. The key word in RCW 62A.3–606(1)(b) is *unjustifiably* impairs any collateral. If impairment alone created the discharge, the word "unjustifiably" in the statute would be surplusage. Instead it is a significant modification of "impairment."

The importance of this modification of "impairment" is recognized in *First Citizens Bank & Trust Co. v. Larson,* 22 N.C. App. 371, 376, 206 S.E.2d 775, 779, *cert. denied,* 286 N.C. 214, 209 S.E.2d 315 (1974):

> Even though impairment of collateral by the holder would generally discharge the surety under the N.I.L. and even though the U.C.C. may have made that defense available to an accommodation endorser; [*sic*] nevertheless, we think the Code had added a requirement. The holder must have *unjustifiably* impaired the collateral.

In that case the court held that failure to file a security agreement was not an unjustifiable impairment when the creditor was not relying primarily on the collateral and the surety was aware of the financial condition of the debtor.

The standard for determining whether an impairment is unjustified is not negligence, as argued by the makers and as held by the trial court. The trial court referred solely to the creditor's negligence in not continuing perfection in the security interest. The court concluded that this negligence impaired the surety's recourse. Additional

---

[2]The official comment to RCWA 62A.3–606 makes it clear that this defense is available to a maker who becomes a surety. The comment is:

The words "any party to the instrument" remove an uncertainty arising under the original section. The *suretyship defenses here provided are not limited to parties who are "secondarily liable,"* but are available to *any party.* who is in the *position of a surety,* having a right of recourse . . . on the instrument . . ..
(Italics ours.)

Defendant's Clerk's Papers (July 28, 1988), at 10. The court erred in employing a negligence standard and in concluding that there was impairment without finding that the creditor's inaction by itself unjustifiably impaired the collateral.

What, then, is the standard for determining when an impairment is unjustified? RCW 62A.3–606 is a codification of an equitable suretyship defense. *National Bank of Wash. v. Equity Investors, supra* at 556 (pro tanto discharge resulting from impairment of collateral is equitable in nature) (citing L. Simpson, *Suretyship* 370 (1950)). Therefore, in determining whether an impairment is unjustified, we hold that the court must examine all the circumstances of the transactions from start to finish. The court should consider the original transaction, the nature and purpose of the security interest, and the transaction which created the suretyship.

When undertaking this analysis, the court should consider the conduct of both the creditor and the surety. The initial step is to consider the nature of the relationship between the two parties. When the suretyship relationship is created by operation of law, as compared to creation by contract, there is less reason to find that a creditor's inaction unjustifiably impaired the collateral.

When considering the creditor's conduct, the court should consider whether the creditor owed a duty to the surety. There are cases which hold that failure to perfect a security interest is per se unjustifiably impairing collateral. *See, e.g., Huey v. Port Gibson Bank,* 390 So. 2d 1005 (Miss. 1980); *Langeveld v. L.R.Z.H. Corp.,* 74 N.J. 45, 52, 376 A.2d 931, 934 (1977); *Peoples Bank v. Pied Piper Retreat, Inc.,* 158 W. Va. 170, 178, 209 S.E.2d 573, 578 (1974). However, there are other cases which, although they do not address the particular question of perfection with which we are faced here, anchor the impairment decision in more stable ground. We are persuaded by these cases that the impairment analysis should begin with the essential inquiry of whether the creditor had any obligation or duty to protect the security interest for the benefit of the surety.

*State Bank v. Arndt,* 129 Wis. 2d 411, 416–20, 385 N.W.2d 219, 222–23 (Ct. App. 1986) is instructive. There the creditor allowed perfection of a security interest in personalty to lapse. The debtor argued that this unjustifiably impaired the collateral thereby allowing foreclosure of a secured interest in real estate. Had the creditor preserved its security in the personalty, recourse to the real estate would have been unnecessary. Although the court held that the surety defenses in U.C.C. § 3–606 (1978) did not apply to the debtor since it was not a surety, the court's reasoning is pertinent. The court noted that nothing in the Uniform Commercial Code nor in the security agreement itself imposes an obligation on the secured creditor to file a continuation statement.

Another well–reasoned opinion is *Commercial Fin., Ltd. v. American Resources, Ltd.,* 6 Hawaii App. 667, 737 P.2d 1120 (1987). There, the court begins with the premise that "there is no unjustifiable impairment unless there is a duty, a breach of that duty, and consequential damages." *Commercial Fin., Ltd.,* at 680. Whether a duty exists is a question of law; breach and damages are questions of fact.

As to the duty question, the court noted the difference between the duties of a creditor in possession of collateral and those of one not in possession. U.C.C. § 3–606 (RCW 62A.3–606) cross–references U.C.C. § 9–207 (RCW 62A.9–207) which imposes specific duties upon a creditor in possession of collateral. No such identifiable duties are imposed on a creditor not in possession. This led the court to conclude: "However, the duties imposed by HRS § 490:3–606(1)(b) [RCW 62A.3–606(1)(b)] on secured holders not in possession of the collateral are less than the duties imposed by it on secured holders in possession of the collateral." *Commercial Fin., Ltd.,* at 680. The court continued its analysis, adhering to the position that a duty question underlies the unjustifiable impairment issue. The court said that "[a] secured holder can be held liable for failure to enforce the security only when it has a duty to enforce the security." *Commercial Fin., Ltd.,* at 681. The

court found no duty to take possession of the collateral or to proceed against the collateral in the event of default.[3]

The Hawaii court's analysis is more consistent with the equitable underpinnings of RCW 62A.3–606 than the per se rule adopted elsewhere, and we hereby adopt it in Washington. Therefore, the initial inquiry in determining if the creditor has unjustifiably impaired the collateral is to ascertain whether the creditor owed any duty to the surety in relation to the collateral. Here, as in *Arndt,* neither the statutes nor the security agreement impose any duty upon the creditor to file a continuation statement. Therefore, such duty could arise only from the equities of the facts of the case. The question then is whether it is more just and equitable that as between this creditor and this surety the law should impose a duty upon the creditor to protect not her interest in the collateral, but the potential recourse rights of the surety. The focus must be on the facts which existed at the particular time when the surety contends the duty arose, *i.e.,* the questions of duty, as a matter of law, and breach, as a matter of fact, are not to be judged by the hindsight of what ultimately happened. We note that the security agreement here involved prohibits the debtor–surety (and therefore its successor) from creating any lien on the secured property without the written consent of the creditor. Clerk's Papers, at 177. This is a factor to be taken into account in determining whether the creditor had a duty to file a continuation statement. If that prohibition had been complied with here there would have been no competing lien against the collateral. This militates against a creditor's duty to protect the collateral solely for the benefit of the surety. Once the facts are established the trial court will have to determine whether the creditor could rely on the prohibition against the voluntary creation of the bank's lien without which there would have been no impairment in fact.

---

[3]In Washington a creditor, likewise, can ignore the security and sue on the debt. *Foster v. Knutson,* 84 Wn.2d 538, 546, 527 P.2d 1108 (1974).

If there is no duty found to run from the creditor to the surety, then the impairment is not unjustified and RCW 62A.3-606 cannot operate to discharge the surety's obligation to the creditor. If (and only if) there is such a duty, the court should then examine the conduct of the surety to see if the surety could reasonably have prevented the harm. The rule here is stated as follows: "It is clear that no . . . duty [to act affirmatively to preserve security] is owed by the creditor to the surety where the surety is himself in a position to preserve the security and fails to do so." L. Simpson, *Suretyship* 376 (1950). *See also* Restatement of Security § 132 (1941). In other words, if the surety had the factual and legal ability to protect his or her right of potential recourse against the collateral, but did not do so, he or she cannot place that burden upon the creditor. When the creditor and the surety have equal right and opportunity to secure the recourse right, it is inequitable to place the burden solely upon the creditor.

For example in *Commercial Fin., Ltd. v. American Resources, Ltd., supra,* the Hawaii court concluded:

> An indorser cannot escape liability on the ground of a holder's failure to resort to collateral where the indorser had full opportunity to preserve the security by paying the balance due on the note and exercising his right of subrogation to the security upon such payment.

*Commercial Fin., Ltd.,* at 682–83 (quoting 11 Am. Jur. 2d *Bills and Notes* § 956 (1963)). Whether the surety here had such opportunity is not resolved by the record, although there is some evidence of at least a partial default by the assignee while the creditor's security interest was still perfected.

In any case, even if the surety did not have such an opportunity here, there may have been other things they could have done to protect their interest. When the assignee bought the business, including the inventory, from the maker it appears that the maker–surety could have taken a security interest in the inventory which, if perfected, would have had priority over the bank's subsequent

security interest. Alternatively, or additionally, the maker–surety could have requested the creditor to file a continuation statement. This record does not disclose what action, if any, the surety took to protect their right of recourse.

If the court determines that the surety could factually and legally have prevented the harm, regardless of any duty owed by the creditor to the surety to protect the collateral, the impairment is "justifiable". In other words, if the surety could have prevented the harm but did not, the surety, by its inaction when it should have acted in its own interest, discharges the creditor's duty. If, however, the creditor owed a duty to the surety and the surety could not have avoided the harm, then the creditor has unjustifiably impaired the collateral.

The burden of proof required to resolve the above questions is as follows. The initial burden is on the maker to establish suretyship (knowledge of and consent to the assumption), a duty on the creditor's part to file a continuation statement, breach of that duty, and damages therefrom. If the maker–surety meets its burden as to these questions, the burden then shifts to the creditor to prove that the surety had the factual and legal ability to prevent the harm to itself.

The defense of RCW 62A.3–606 is equitable in nature. This case illustrates why the equities must be evaluated in determining whether the impairment was unjustified. To illustrate we examine the evidence, appreciating that the trial court has not yet exercised its fact–finding function, and note that our observations are not conclusive but should be considered by a fact finder.

The creditor states that she did not ask for collateral because she knew the buyers–makers and considered them capable of paying the note without regard to collateral. Because the potential collateral was retail inventory she did not consider it much protection. The creditor points out that the earnest money agreement did not provide for any collateral to secure the note. The contract of sale conveyed the inventory to the buyers–makers (sureties) without

mention of collateral. The note did state that it was secured by a security agreement, but conceivably was confusing at best because it stated it was "*conveying*" certain personalty to the payee–creditor. The closing attorney and drafter of the documents was the makers' attorney. The financing statement was not filed for 2 months. The reason for the delay in filing is not in the record, but could be important as it appears that a timely filing would have preceded the bank's filing.

The creditor denies any knowledge of the law providing for a 5–year life of the security interest or the necessity of filing a continuation statement. The closing attorney never advised her of this fact. She denies any request by anyone that she file a continuation statement.

These assertions are all relevant to the question of whether it is equitable to impose on the creditor a duty to act affirmatively to continue perfection of the security interest.

### III

Next, if all of the above issues are resolved in favor of the surety and the trial court therefore determines that the creditor unjustifiably impaired the collateral, the issue of the correct measure of damages is raised.

The parties assume that U.C.C. Article 9, more precisely RCW 62A.9–504, .9–505, directly apply to resolve this problem. However, both RCW 62A.9–504 and .9–505 delineate the rights of a *secured party* following default by the debtor. Therefore, for the surety to obtain the benefit of these sections, it must be a secured party. A *secured party* is a "person in whose favor there is a security interest . . . ". RCW 62A.9–105(1)(m). A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." RCW 62A.1–201(37). It does not appear that the surety here actually has a security interest in the personalty at issue. Rather, its right is still one of subrogation to the position of the creditor. The right of subrogation is not a security interest. *See,*

*e.g.*, 2 J. White & R. Summers, *Uniform Commercial Code* § 23-6 (3d ed. 1988); *National Shawmut Bank v. New Amsterdam Cas. Co.*, 411 F.2d 843, 847 (1st Cir. 1969); *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971). Therefore the surety is not technically a secured party and U.C.C. Article 9 does not technically apply.

■ Although the surety does not actually occupy the position of a secured party, we treat it as such. In determining the correct measure of damages, our goal is to put the surety where it would have been if the creditor had not impaired the collateral. If the creditor had not impaired the collateral and had sought payment of the debtor's obligation from the surety, the surety, upon payment, would have been subrogated to the rights of the creditor; the surety would have stepped into the creditor's shoes and itself been a secured party. As such, it could have proceeded against the collateral under U.C.C. Article 9. The extent to which the surety is no longer able to proceed against the collateral once the creditor obtains a judgment against the surety, *i.e.*, the extent to which the collateral is impaired, is the issue in this case. Therefore, even though the surety is not yet a secured party, and even though the surety has not yet taken possession of or sold the collateral, U.C.C. Article 9 should be applied by analogy to determine the net amount the surety *would have* realized upon being subrogated to the creditor's position—becoming a secured party. That amount is the amount by which the creditor's recovery against the surety will be reduced.

The creditor contends that the value of the impaired collateral should be reduced by the projected costs of sale of the collateral. There was testimony as to the gross value of the inventory and the projected costs of sale, but the trial court established the damage as the gross value without reduction for the cost of sale. The creditor relies on RCW 62A.9-504, which governs the secured party's right to dispose of collateral after default. RCW 62A.9-504(1)(a) authorizes deduction of various expenses of disposition, including reasonable costs of sale of the collateral.

The Court of Appeals held this section inapplicable because there was no default or sale after taking possession. We disagree. As already noted, the question of what actually happened is irrelevant to the determination of this question. It was impossible for the surety to actually take possession of and sell the property because the creditor impaired the collateral. The proper question, then, in determining the remedy for impairment is what *would* the surety have done had the collateral not been impaired. It is possible that the surety would have sold the property, therefore the remedy provided by RCW 62A.9–504 should not be discounted out of hand.

The surety, on the other hand, argues that it could have taken possession of the collateral in satisfaction of the debt under RCW 62A.9–505(2), thereby avoiding costs of resale. The surety asserts it would have waived any deficiency above the value of the collateral. We make no determination whether the surety is legally correct in this interpretation of RCW 62A.9–501(3)(c) and RCW 62A.9–505(2). We do note that the surety cites nothing in the record to support its contentions, which are matters of fact and must therefore be determined by the trier of fact.

In rejecting the possible allowance of the costs of sale, the trial court and the Court of Appeals overlooked the fundamental purpose of recognizing the defense of unjustifiably impaired collateral. The goal of that defense is to put the surety in as good a position as it would have been in if the surety had recourse to unimpaired collateral. It is error to assume that the surety would have taken possession of the collateral. What a reasonable prudent surety would have done under these facts must be determined as a matter of fact, taking into account the legal rights of all parties. Because the surety has not cited any factual basis to support its contention that it would have taken possession and waived a deficiency (if that in fact is the legal result), we refuse to assume that it in fact would have so acted. That is an unresolved factual matter. If the court determines all the above issues in favor of the debtor and then determines

that a surety, acting in a reasonably prudent manner, would have more likely disposed of the collateral, the expenses authorized by RCW 62A.9–504(1)(a) should be deducted from the gross value of the collateral. To do otherwise would put the surety in a better position than if the creditor had preserved the collateral for recourse by the surety.

Finally, if the surety prevails on remand, is the surety entitled to attorney fees? The original sale contract between the creditor and the maker provided for attorney fees to the complaining party and the note provided that the maker would pay attorney fees in a collection suit. RCW 4.84.330 states that in an action on a contract which provides that attorney fees which are incurred to enforce the provisions of such contract shall be awarded to one of the parties, the prevailing party shall be entitled to reasonable attorney fees. In other words the statute makes mutual the potential liability for attorney fees even though the contract sued upon may impose only a unilateral obligation.

The controlling question is whether the surety's action was "on a contract" as required by statute.

The trial court denied attorney fees because the surety's pro tanto discharge arose from a duty imposed by statute, RCW 62A.3–606, rather than on the contract. The Court of Appeals reversed, reasoning that the sale contract and note were central to the dispute and relying primarily on *Western Stud Welding, Inc. v. Omark Indus., Inc.*, 43 Wn. App. 293, 299–300, 716 P.2d 959 (1986). We agree with the principle of *Omark*, but note that the attorney fees provision there was broader than that provision here. If the contract containing the attorney fee provision is central to the controversy, the statute applies. We do not, however, consider the parties' underlying documents to be central to this controversy (as contemplated by the court in *Omark*).

The whole dispute arises from the surety's agreement with the assignee whereby the assignee assumed the debt to the creditor. That agreement and the statute, RCW 62A.3–606, together with the creditor's alleged duty imposed by

operation of law, are central to the dispute. When the underlying documents merely provide the background out of which the surety allegedly acquires new rights and duties by operation of law and by their voluntary actions in obtaining the assignee, it is apparent that the action is not "on the contract." The surety's argument, and the holding of the Court of Appeals, is analogous to a but–for argument in a proximate cause question. Rejecting that approach, we conclude that the voluntary actions of the original makers of the note created the central issue of the legal effect of their actions in creating a possible suretyship relationship. Therefore, if the sureties prevail on retrial, they are not entitled to attorney fees.

The matter is remanded for proceedings consistent herewith.

DOLLIVER, ANDERSEN, DURHAM, and SMITH, JJ., and CALLOW, J. Pro Tem., concur.

GUY, J. (concurring in part, dissenting in part)—This case presents the question whether the trial court erred in ruling on summary judgment that the maker of a note became a surety by operation of law when an assignee contractually assumed the maker's debt. I agree with the majority that reasonable minds could differ as to whether the Millers actually knew of, and consented to, the assignee's assumption of the Hemenways' debt to the Millers. Therefore I agree that whether the Hemenways became sureties by operation of law should not have been disposed of by summary judgment.

I disagree, however, with the majority's treatment regarding whether the Millers unjustifiably impaired the collateral by failing to file a continuation statement.[4]

---

[4]Note that, strictly speaking, this issue is not before the court and therefore the majority's discussion of it is dicta. In holding that the trial court erred in granting summary judgment on the issue whether the Hemenways became sureties by operation of law, we create the possibility that on remand the court will conclude that the Hemenways did not become sureties. Since the unjustifiable

Assuming that the Hemenways became sureties in relation to the Millers by operation of law, I would hold that the Millers' failure to file a continuation statement constitutes unjustifiable impairment of the collateral. The law regarding this issue is clear. A creditor has a duty not to impair the collateral unjustifiably. What constitutes "unjustifiable" impairment depends on equitable considerations specific to the transaction, as the majority asserts, but those considerations must be viewed against the backdrop of the creditor–surety relationship. "The accommodation party has every right to assume that his or her obligation is only that over what can be realized from enforcement of the security interest, either by the holder or by himself or herself if he or she pays and subrogates to the holder's right of enforcement." 2A F. Hart & W. Willier, *Commercial Paper under the Uniform Commercial Code* § 13.24[1], at 13–107 (1989). Therefore, the surety is entitled to assume that the creditor will take steps to prevent impairment of the collateral. Such steps include "those steps customarily taken by creditors with reference to the collateral". F. Hart & W. Willier § 13.24[1], at 13–104. Such steps also include those the creditor can take with convenience: the creditor need not take burdensome steps to protect the collateral, such as expensive and prolonged litigation. L. Simpson, *Suretyship* § 75 (1950). In this case, all the Millers needed to do to protect the security interest in the inventory was to file a continuation statement. Such an action is a convenient, nonburdensome action customarily taken by creditors with reference to collateral. As such—assuming the Hemenways were sureties—the Millers' failure to take that action constituted an unjustifiable impairment of collateral.

Moreover, most courts have held that failure to perfect a security interest constitutes an unjustifiable impairment of collateral. *See, e.g., In re Estate of Voelker,* 252 N.W.2d 400 (Iowa 1977) (creditor took security interest in crop but,

---

impairment issue arises only if the Hemenways were sureties, such a conclusion by the trial court would render irrelevant this court's discussion of that issue.

by omitting description of real estate on which crop was planted, failed to perfect); *North Bank v. Circle Inv. Co.,* 104 Ill. App. 3d 363, 432 N.E.2d 1004 (1982) (creditor failed to obtain a signed security agreement); *Executive Bank of Fort Lauderdale v. Tighe,* 66 A.D.2d 70, 411 N.Y.S.2d 939 (1978) (secured party filed security agreement in wrong office); *El–Ce Storms Trust v. Svetahor,* 223 Mont. 113, 724 P.2d 704 (1986) (creditor failed to file until after second creditor perfected its interest); *see generally* F. Hart & W. Willier § 13.24[1], at 13–107. If failure to perfect is unjustifiable impairment, then I can see no sound basis for holding that failure to *continue* perfection is not.

The majority's argument for the contrary position cannot be supported. In the initial step of its argument, the majority reasons that to determine whether a creditor has unjustifiably impaired the collateral, the court must inquire whether the creditor owed a duty to the surety in relation to the collateral. The majority opines that such a duty could arise only from the equities of the case, and it notes a fact that, in its view, militates against finding any such duty: "the security agreement here involved prohibits the debtor–surety (and therefore its successor) from creating any lien on the secured property without the written consent of the creditor. . . . If that prohibition had been complied with here there would have been no competing lien against the collateral." Majority opinion, at 736.

This initial step in the majority's analysis is unsupported for three reasons. First, the existence of the prohibition against creating second liens without the Millers' consent should not be taken as an equitable consideration that weighs in favor of the Millers and against the Hemenways. If the Hemenways had been the ones who violated this provision, then perhaps fairness would support making them bear the burden of the loss. But it was the assignee, not the Hemenways, who violated that provision. The Hemenways, as well as the Millers, were entitled to rely on the provision for their protection.

Second, the majority's analysis does not consider the relevant facts that might establish on remand that the Hemenways became sureties by operation of law, but these facts are relevant to the fairness of holding that the Millers' actions constituted unjustifiable impairment. For example, before they executed the second consent to assignment agreement, the Millers required the assignee to produce a financial statement. In addition, the Millers accepted payments on the note directly from the assignee, and they knew that their collecting bank had changed the account collecting name from "Hemenway" to "Miller". Moreover, the Millers did not look to the Hemenways for payment until after the assignee defaulted. These facts should be weighed when considering the fairness of holding the Millers to a duty to file a continuation statement.

Third, the majority's analysis also fails to consider the principle that the surety is entitled to assume that the creditor will take reasonable precautions to protect the collateral. This principle is itself based on equitable considerations. L. Simpson § 75, at 380. Applied here, it implies that the Hemenways, as sureties, were entitled to assume that the Millers would take convenient, nonburdensome actions to prevent impairment of the collateral.

For the above reasons, I disagree with the majority's suggestion that equity weighs in favor of the Millers on the impairment of collateral issue. I also disagree with the majority's analysis in the second step of its argument. Quoting L. Simpson, *Suretyship* § 75, at 376 (1950) as authority, the majority relies on the principle that the creditor owes the surety no duty to act affirmatively to preserve security where the surety is in a position to preserve the security, but fails to do so. Majority opinion, at 737. Applying this principle, the majority argues that the Hemenways could themselves have preserved the security either by having requested the Millers to file a continuation statement or by having taken a security interest in the inventory when they sold the business to the assignee. Majority opinion, at 737–38.

I cannot agree with the second step of the majority's argument. The majority partially quotes Simpson. I read Simpson differently on the principle regarding the creditor's lack of duty to preserve the collateral in all situations. Simpson does state that where the surety is in a position to preserve the security but fails to do so, the creditor has no duty to protect the collateral; but he also states that the creditor has a duty to take nonburdensome action to protect the collateral. L. Simpson § 75, at 376. Simpson's subsequent discussion makes clear that the creditor's duty to take nonburdensome actions to protect the collateral may exist even if the surety also could have taken steps to protect it. Simpson states:

> [W]here the only action necessary to perfect the security, taken when the surety contracts, is recording a mortgage or registering an assignment, the surety has generally been held to be discharged to the extent of the value of the security if it is lost through the creditor's failure to do the necessary act. In a leading case the basis for the rule is stated as follows: "There was property sufficient to protect the creditor and sureties. . . . The simplest act on the part of the mortgagee and custodian of the paper could save the surety harmless by reason of his friendly act for the benefit of the plaintiff. . . . Can it be contended that the [surety] must have first interested himself in the matter of filing and recording the mortgage? This would have been unusual. The plaintiff, and not the sureties on the note, took the mortgage. . . . Can he who has taken the security stop short, and omit to do so that which makes it chiefly valuable, under the excuse that others did not urge him to file it, or furnish the pittance necessary to pay the recorder?"

L. Simpson § 75, at 378–80 (quoting *Burr v. Boyer*, 2 Neb. 265, 271 (circa 1870)). Thus *Burr v. Boyer, supra,* the leading case on which Simpson relies, expressly provides that a creditor cannot defend its failure to file a mortgage by arguing that the surety should have urged it to do so or should have interested itself in the matter of filing and recording. Here, the majority argues that the Millers may defend their failure to file a continuation statement by arguing that the Hemenways should have urged them to do so or should have perfected a second security interest in

favor of themselves when they sold the business to the assignee. Equivalent arguments were rejected in *Burr v. Boyer, supra,* and, by implication, rejected by Simpson. Thus the majority's application of the principle—that where the surety is in a position to preserve the security but fails to do so, the creditor has no duty to protect the collateral—is actually rejected by Simpson, the very authority on which the majority purports to rely.

In sum, I concur with the majority that the issue whether the Hemenways became sureties by operation of law should not have been disposed of on summary judgment. I dissent, however, from the majority's treatment of the impairment of collateral issue. I would hold that if the Hemenways became sureties by operation of law, then the Millers unjustifiably impaired the collateral by failing to file a continuation statement.

DORE, C.J., and UTTER, J., concur with GUY, J.