[No. 26501-6-I. Division One. March 30, 1992.]

ARTHUR DONALD WATKINS, ET AL, *Appellants,* v.
RESTORATIVE CARE CENTER, INC.,
ET AL, *Respondents.*

*Deborah A. Elvins* and *Stoel Rives Boley Jones & Gray; D. Bruce Morgan* and *Morgan & McDonald, P.S.; Lisa Marie Stone;* and *Thomas H. Grimm* and *Inslee, Best, Doezie & Ryder P.S.,* for appellants.

*John P. Mele* and *Ryan, Swanson & Cleveland,* for respondents.

PEKELIS, J. — Arthur Donald Watkins and Florence R. Watkins, mortgagors of a nursing home facility known as the Restorative Care Center (Center), and the Center's lessor-owners (hereinafter referred to collectively as the Watkins) appeal from an order granting partial summary judgment in favor of Restorative Care Center, Inc., its shareholders, and its wholly owned subsidiary, C&L Concerns, Inc. (C&L), the Center's lessee-operator (hereinafter referred to collectively as RCC). The Watkins also appeal from the trial court's award of attorney fees in favor of RCC. We affirm the trial court's partial summary judgment order, but reverse its attorney fees award in favor of RCC.

## I
### FACTS

The following facts are not in dispute: In the late 1950's, Arthur and Florence Watkins established and began operating the Center as an 80-bed nursing home facility.

In 1972, Arthur and Florence Watkins began to implement a plan to expand the Center into a 250-bed facility. As a legal prerequisite to the expansion, Arthur and Florence Watkins applied to the Department of Social and Health Services (DSHS) for a certificate of need for a 250-bed nurs-

ing home facility. On September 8, 1972, DSHS issued Arthur and Florence Watkins a certificate of need authorizing them to expand the Center into a 250-bed facility.

To finance the Center's expansion, Arthur and Florence Watkins obtained a bank loan, which was secured by a mortgage. The loan was insured by the United States Department of Housing and Urban Development (HUD). As a condition for receiving HUD insurance, Arthur and Florence Watkins entered into a regulatory agreement with HUD in which they promised to comply with certain requirements relating, *inter alia*, to the maintenance, use, and conveyance of the Center.

Construction of a new multistory building was completed in 1974. Shortly afterward, Restful Manor Convalescent Center, Inc. (Restful Manor), Arthur and Florence Watkins' wholly owned corporation, successfully applied to DSHS for a license to operate a 250-bed nursing home at the Center. On December 27, 1974, Arthur and Florence Watkins leased the Center to Restful Manor. Among other things, the lease conveyed possession of the Center's "premises"; prohibited the use of the Center's "premises" for any purpose other than as a nursing home facility; required the return of the Center's "premises in as good condition as they were when leased"; expressly incorporated the terms and conditions of the 1973 HUD agreement; and contained an attorney fees provision requiring payment of attorney fees incurred by the Center due to any default in the performance of the lease.

In February 1975, Restful Manor, pursuant to one of its covenants as a lessee, entered into a regulatory agreement with HUD. By the 1975 HUD agreement, Restful Manor agreed that:

> (5) The lessee shall at all times *maintain in full force and effect a license from the state or other licensing authority to operate the project as a nursing home . . .*
>
> . . . .
>
> (7) Lessee shall not remodel, reconstruct, add to, or demolish any part of the mortgaged property *or subtract from any real or personal property of the project;*

(8) Lessee *shall not use the project for any purpose except the operation of a nursing home;*

(Italics ours.)

In 1977, an addendum to the lease was executed stating that the lease included "personal property of Lessor presently located on the leased premises and used or useful in the conduct of Lessee's business . . ." and that such personal property must be maintained in good repair. The addendum also required the "return [of] said personal property or replacement property of at least equal utility and value to Leasor [*sic*] upon the termination of this lease". Restful Manor remained the licensed operator of the Center until 1978, when Arthur and Florence Watkins sold their entire interest in Restful Manor to C&L.[1] When C&L acquired Restful Manor, it assumed Restful Manor's obligations under the lease. Later in 1978, C&L obtained a license authorizing it to operate the Center as a 250-bed nursing home facility. C&L was acquired by RCC in 1986. In the purchase and sale agreement, RCC agreed to guarantee C&L's performance of the lease.

C&L maintained its license and continued to operate the Center as a 250-bed nursing home facility from 1978 until September 1987, when C&L found itself in financial difficulty. In order to raise money and to avoid an involuntary delicensure, RCC, C&L's sole shareholder, entered into a written agreement with DSHS. Pursuant to the DSHS agreement, C&L immediately received $244,295 from DSHS in settlement of a pending Medicaid reimbursement appeal and an increase in its per diem Medicaid reimbursement rate.

In return, RCC agreed that "the number of beds in operation at [the Center] shall be reduced by 61 beds to a total of 189 beds . . . [and] [u]pon renewal of [C&L's] license . . . [the Center] will be relicensed for 189 beds." Paragraph 6 of the

---

[1]Arthur and Florence Watkins subsequently sold the Center to several purchasers as cotenants, assigning their lessor's interest in the lease to the cotenants, while retaining their security interest in the Center as mortgagors.

DSHS agreement stated that the agreement contemplated that RCC would seek to sell to another operator "that portion of its *current bed authority* applicable to the 61 beds".[2] (Italics ours.)

Pursuant to the DSHS agreement, a portion of the Center's original facility, known as the Annex, was closed and C&L obtained a new license in April 1989, authorizing the operation of a 189-bed nursing home facility. RCC never sold the "current bed authority for 61 beds" referred to in the DSHS agreement.

## II
### THE LAWSUIT

On February 5, 1988, the Watkins commenced a declaratory action, alleging that the DSHS agreement delicensing 61 of the Center's nursing home beds constituted a breach of the lease by RCC. Furthermore, the Watkins alleged that, as lessors of the Center, they were third party beneficiaries of the guarantor provision of the purchase and sale agreement between Carolyn and Leo Pavloff, the former owners of C&L, and RCC. As third party beneficiaries, the Watkins contended they were entitled to damages from RCC for the alleged breach of the lease. The Watkins also requested injunctive relief and attorney fees under the lease.

RCC denied breaching the lease, asserting that the Watkins lacked any legal interest in the Center's bed authority. In addition, RCC counterclaimed, alleging that the Watkins had tortiously interfered with its business relations by impeding its efforts to sell the bed authority for the 61 beds. RCC also claimed it was entitled to its attorney fees under the purchase and sale agreement.

---

[2]As originally drafted, paragraph 6 read:

"This Agreement contemplate[s] that [RCC] *will seek to transfer that portion of its license applicable to 61 beds to another operator for consideration.* [DSHS] acknowledges that the said 61 beds are appropriate and needed under the Health Plan for King County. Accordingly, [DSHS] will approve the transfer if the transferee meets [DSHS's] criteria for operation of licensed nursing homes." (Italics ours.)

On December 19, 1989, RCC filed a motion for partial summary judgment on the Watkins' lease claims. In opposition to the motion, the Watkins submitted the declaration of Arthur Watkins stating that, as the Center's owner and as Restful Manor's principal officer, his intent when entering the lease was to "preserve, maintain, and operate the [Center] as a 250-bed facility." Watkins also stated that he "always understood that both [HUD] Agreements . . . require[d] that the nursing home be operated and licensed as a 250-bed facility."

The Watkins also offered the deposition testimony of Robert M. Gray, the DSHS attorney who had revised the DSHS agreement to acknowledge that RCC would seek to sell its "current bed authority applicable to the 61 beds". Gray testified as follows:

Q: Do you recall discussions with anybody about what it was they were being permitted to transfer, whether current bed authority, license?

A: Certainly in the course of working out this agreement with all the parties they initially drafted it to reflect license, but upon reviewing the statute governing licensing of nursing homes it specifically indicates that the license is not transferable. It is unique to the operator. And what they were selling . . . wasn't the license. It was the authority to operate 61 beds, which is to say certificate of need authority, which is distinct from the operator's license, which is why paragraph six reflects a license being crossed out and current bed authority inserted. That's the nearest synonym I could think of.

The Watkins further provided correspondence from HUD officials, dated March 22, 1988, and June 29, 1989, expressing HUD's understanding of the certificate of need and the license each as constituting a "species of personal property belonging to the [insured] project." According to the Watkins, the 1975 HUD agreement prohibited RCC from "subtract[ing]" from the Center's personal property.

The trial court granted RCC's motion for partial summary judgment, concluding that, as a matter of law, the Watkins had no legal interest in the nursing home beds

authorized under C&L's license and that the delicensure of the 61 beds did not constitute a violation of the lease.

At the outset of trial on the remaining claims, the Watkins sought to amend their complaint to delete their third party beneficiary claim against RCC. The trial court granted the motion on condition that RCC be deemed the "prevailing party" on that claim for purposes of an award for attorney fees.

Following trial, the trial court dismissed RCC's counterclaim for tortious interference. The trial court also determined that the attorney fees provision in the purchase and sale agreement applied because the Watkins had alleged third party beneficiary status. Accordingly, the trial court awarded RCC its attorney fees as the prevailing party.

The Watkins appeal from the trial court's order granting partial summary judgment, as well as its award of attorney fees in favor of RCC. They also appeal from the trial court's denial of their request for attorney fees.

## III
### ANALYSIS

The Watkins contend that the trial court erred in granting partial summary judgment in favor of RCC because, as a matter of law, (1) the certificate of need granted to them by DSHS conferred an independent property right upon the Center to be continuously maintained as a 250-bed nursing home facility; (2) RCC breached its common law duties as lessee when it agreed to delicense 61 beds; and (3) RCC breached the provisions of the lease and the 1975 HUD agreement which, according to the Watkins, required RCC to preserve the Center's "bed authority" and/or to maintain a license for a 250-bed nursing home facility. The Watkins also assert that, at a minimum, the evidence they submitted created a genuine issue of material fact as to whether RCC breached the lease or the 1975 HUD agreement.

■ On review of a summary judgment, the appellate court places itself in the position of the trial court and,

considering the evidence in the light most favorable to the nonmoving party, must assess whether "the pleadings, depositions . . . and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Del Guzzi Constr. Co. v. Global Northwest, Ltd.*, 105 Wn.2d 878, 882, 719 P.2d 120 (1986) (quoting CR 56(c)).

A. Existence of a Property Right.

The Watkins assert first that the 1972 certificate of need issued by DSHS entitled the Center to be continuously "maintained" as a 250-bed nursing home facility. Thus, the Watkins contend that by entering into the DSHS agreement, RCC wrongfully relinquished a valuable property right belonging to the Watkins. The Watkins characterize this property right as "the Certificate of Need bed authority to operate 61 nursing home beds".[3]

The Watkins' argument is flawed factually and legally. First, their contention is premised on a factual misconception of the nature of a certificate of need. The scheme for the development of nursing home facilities in the state of Washington is established by statute and administered by DSHS. *See* RCW 70.38; WAC 246-310. Pursuant to the certificate of need program, DSHS allocates a finite number of nursing home beds among competing applicants. *See* RCW 70.38.115; WAC 246-310-130. The number of available beds is determined by the number of nursing home beds "necessary for reasonable and appropriate use" in each planning area. WAC 246-310-360. In 1972, a certificate of need authorized a successful applicant to commence construction of a new nursing home facility or to expand an existing facility.

---

[3]The Watkins contend that they have been damaged because nursing home design requirements have changed since the Annex was built, but that as long as the Annex remained in continuous use, it was not required to meet current standards. Now that the Annex's continuous use has been interrupted, the Watkins must incur the substantial construction costs of meeting current design standards. The Watkins also assert that the reduction in the Center's bed capacity has diminished the Center's market value.

*See* RCW 70.38.110; WAC 248-19-040(1).[4] However, the certificate of need was valid only "for such period of time, not to exceed two years, as may reasonably be required to . . . undertake construction of the . . . nursing home in question", unless renewed by DSHS "for such further periods as may be reasonable" to actually begin construction. RCW 70.38.160; WAC 248-19-040(2).[5]

Thus, the 1972 certificate of need merely conferred the right to *expand* the Center into a 250-bed nursing home facility, a right which expired, at the latest, in 1974 when construction of the Center's new building was completed. On the other hand, the right to *maintain*, in the sense of the right to *operate*, a particular nursing home facility is the exclusive right of a licensed operator. Before commencing legal operation of a nursing home facility in Washington, an individual or an entity must obtain a license from DSHS. RCW 18.51.030. The license is valid only for the operation of a nursing home facility at the location specified in the license application. RCW 18.51.050. Moreover, unlike certificates of need, nursing home licenses are not transferable or assignable. *Compare* RCW 18.51.050 (nursing home licenses are not transferable or assignable to another) *with* WAC 246-310-500(7) (certificates of need are transferable and assignable to another subject to DSHS approval).

■ Thus, we conclude that any rights granted under the certificate of need did not create a cognizable property right in the Center to be continuously "maintained" as a 250-bed nursing home facility. This is not to say that the 250-bed nursing home facility developed by Arthur and Florence Watkins pursuant to DSHS's authorization did not have intrinsic value. The Center is apparently only one of a finite number of nursing home facilities which a licensed operator

---

[4]RCW 70.38.110 was repealed by Laws of 1979, 1st Ex. Sess., ch. 161, § 21, p. 1552. WAC 248-19-040(1) was repealed by WAC 79-12-079.

[5]RCW 70.38.160 was repealed by Laws of 1979, 1st Ex. Sess., ch. 161, § 21, p. 1552. WAC 248-19-040(2) was repealed by WAC 72-12-079.

could lease. Nevertheless, even if, as the Watkins contend, the Center's value has been diminished because it can no longer be leased as a 250-bed nursing home facility, the question remains: Under what legal theory may the Watkins recover against RCC for the loss of the Annex's 61 beds?

■ The Watkins appear to argue that if they can show the existence of some species of property right, then RCC had a duty to protect this right.[6] The Watkins cite a number of cases in which property interests were recognized. *See, e.g., State v. Scheffel,* 82 Wn.2d 872, 876, 514 P.2d 1052 (1973) (driver's license), *appeal dismissed,* 416 U.S. 964 (1974); *State ex rel. Arrow Transp. Co. v. State Utils. & Transp. Comm'n,* 60 Wn.2d 825, 830, 376 P.2d 433 (1962) (freight permit); *Lee & Eastes, Inc. v. Public Serv. Comm'n,* 52 Wn.2d 701, 704-05, 328 P.2d 700 (1958) (right to operate business). However, none of these cases advances the Watkins' position. In the cases cited, the courts recognized a property interest in determining that constitutional due process safeguards applied because the *State* had interfered with that interest. There is no authority provided in support of the Watkins' underlying assumption that a private entity has a duty to protect a property right in another absent some agreement.

■ The Watkins refer this court to only one case involving the property right asserted here. In *Lonoke Nursing Home, Inc. v. Wayne & Neil Bennett Family Partnership,*

---

[6]The Watkins cite numerous cases involving riparian water rights. *See, e.g., Department of Ecology v. Abbott,* 103 Wn.2d 686, 694 P.2d 1071 (1985); *Adamson v. Black Rock Power & Irrig. Co.,* 12 F.2d 437 (9th Cir. 1926). This concept is inapposite. Under Washington law, a water right is considered real property which is appurtenant to and passes with a conveyance of the land which receives its beneficial use. *Foster v. Sunnyside Vly. Irrig. Dist.,* 102 Wn.2d 395, 400, 687 P.2d 841 (1984). However, there is no indication that the rights conferred by certificates of need vest in real property and/or "run with the land". In fact, under current regulations, certificates of need authorize "persons" to develop nursing home facilities. *See* WAC 246-310-010(6), (8), (32).

676 S.W.2d 461, 462-63 (Ark. Ct. App. 1984), the lessee-operators of two licensed nursing home facilities sought to transfer the state-allocated "bed capacity" of the two facilities to another nursing home facility which they owned. The court on appeal affirmed the trial court's order granting an injunction in the lessor's favor. *Lonoke*, 676 S.W.2d at 463. However, the affirmance was based on the terms of the *lease*, not on an independent property right. *Lonoke*, 676 S.W.2d at 463-64. Thus, *Lonoke* is not authority for the proposition that a lessor of a nursing home facility has a species of property right in the state-authorized bed capacity as a matter of law.

Moreover, in its supplemental opinion on rehearing, the *Lonoke* court expressly declined the parties' request to determine their respective rights in the licensed bed capacity of the lessee-operators' nursing home operation once the lease terminated. *See Lonoke Nursing Home, Inc. v. Wayne & Neil Bennett Family Partnership*, 679 S.W.2d 823, 824-25 (Ark. Ct. App. 1984) (en banc). In a concurring opinion, Judge Glaze observed that the lessor owned only the land and buildings in which the nursing home facility was operated and that the lessor's interest in the bed capacity of the lessee-operators' nursing home license was "incidental", arising solely out of the lease requirement to maintain a home on the premises. *Lonoke*, 679 S.W.2d at 825-26. Judge Glaze noted that granting the lessor any continuing interest in or control over the lessee-operators' nursing home license would be contrary to Arkansas law, which prohibits the transfer or assignment of such a license. *Lonoke*, 679 S.W.2d at 826. Because nursing home licenses are not transferable or assignable in Washington either, this analysis is equally applicable here.

B. RCC's Common Law Duties as Lessee.

We next consider the Watkins' assertion that RCC, as lessee, owed them a common law duty to maintain and to return a 250-bed nursing home facility to the Watkins at

the expiration of the lease. The Watkins claim that by relinquishing the licensed operation of 61 beds, RCC is liable for substantially diminishing the value of the Watkins' reversionary interest in the Center's property. In a related argument, the Watkins also contend that by entering into the DSHS agreement, RCC committed waste of their property.

■■ A landlord's reversion is the estate left in the lessor upon completion of the lease term. *See* 51C C.J.S. *Landlord & Tenant* § 252 (1968). A landlord has a right to recover for wrongful injuries to the reversion. *See* 49 Am. Jur. 2d *Landlord and Tenant* §§ 86-91 (1970). Similarly, under RCW 64.12.020, tenants of real property are prohibited from committing waste of the lessor's property. Waste is "an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession which results in substantial injury." *Graffell v. Honeysuckle*, 30 Wn.2d 390, 398, 191 P.2d 858 (1948).

However, in order for either of these theories to apply, the Watkins would first have to establish a cognizable property right in maintaining the Center as a 250-bed nursing home facility. As we have concluded above, the Watkins cannot demonstrate that such a right exists. Moreover, the Watkins have cited no cases, nor have any been found, recognizing a lessor's reversionary interest in intangible property rights or the application of an action in waste to intangible property. Indeed, the law is to the contrary. *See Dipson v. Intrastate Theatre Corp.*, 278 A.D. 1016, 106 N.Y.S.2d 107, 108 (1951) (damages for loss of reputation, goodwill and other intangibles are not recoverable in action of waste); 49 Am. Jur. 2d *Landlord and Tenant* §§ 86-90 (1970) (loss of or damage to lessor's physical property constitutes actionable injury to lessor's reversionary interest). Accordingly, we reject the Watkins' assertion.

C. Breach of Lease and the 1975 HUD Agreement.

The Watkins contend further that RCC's actions in entering into the DSHS agreement constituted a breach of several lease provisions. These breaches purportedly arise

from (1) RCC's failure to return the "premises in as good condition as they were when leased"; (2) RCC's breach of its promise not to use the Center's premises for any purpose other than as a nursing home; and (3) RCC's failure to return the Watkins' "personal property . . . used or useful in the conduct of [RCC's] business" upon termination of the lease.

In addition, the Watkins contend that RCC breached the terms of the 1975 HUD agreement by failing to maintain a 250-bed license in "full force and effect" and by "subtract[ing]" from the Center's "personal property".

 Leases are contracts as well as conveyances, and the rules of construction which apply to contracts also apply to them. *Seattle-First Nat'l Bank v. Westlake Park Assocs.*, 42 Wn. App. 269, 272, 711 P.2d 361 (1985), *review denied*, 105 Wn.2d 1015 (1986). If a lease incorporates other agreements, they will be construed together and should receive a reasonable, sensible construction. *White v. Coates*, 17 Wn.2d 686, 693, 137 P.2d 113 (1943).

 In construing a contract, "[i]t is the duty of the court to declare the meaning of what is written, and not what was intended to be written." *Berg v. Hudesman*, 115 Wn.2d 657, 669, 801 P.2d 222 (1990) (quoting *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944)). As an aid in elucidating the meaning of the words employed, extrinsic evidence is admissible to ascertain the parties' intent. *Berg*, 115 Wn.2d at 669 (citing *Pollock*, 20 Wn.2d at 348-49). Extrinsic evidence for this purpose includes (1) the situation of the parties at the time the instrument was executed, (2) the circumstances under which the instrument was executed, and (3) the subsequent conduct of the contracting parties. *See Berg*, 115 Wn.2d at 668-69. The reasonableness of the parties' respective interpretations may also be a factor in interpreting a contract. *Berg*, 115 Wn.2d at 668. However, unilateral and subjective beliefs about the impact of a written contract do not constitute evidence of the parties' intent. *Olympia Police Guild v. Olympia*, 60 Wn.

App. 556, 559, 805 P.2d 245 (1991) (citing *Dwelley v. Chester-field*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977)).

There is no merit to the Watkins' contention that RCC breached any provision of the lease and/or the terms of the 1975 HUD agreement. The lease and agreement provisions cited by the Watkins simply did not protect the Center's alleged "bed authority" nor imposed upon RCC the very substantial obligation of maintaining a 250-bed license for the Center. The lease required the return of the Center's "premises" in as good condition as they were when leased. The term "premises" generally refers to a definite physical area. *See* Black's Law Dictionary 1181 (6th rev. ed. 1990). Thus, the promise to return the "premises" in as good condition as when leased did not encompass an obligation to preserve the Center's bed authority or the 250-bed license.

Furthermore, neither Arthur Watkins' declaration stating that his intent as both original lessor and lessee was to maintain the Center as a 250-bed nursing home facility, nor the fact of the Center's continuous operation as a 250-bed nursing home facility for nearly 13 years constituted competent evidence on the issue of the parties' intent. Arthur Watkins states, for the first time in 1990, that the preservation of the Center's 250-bed authority was contemplated at the time the lease was executed. However, Arthur Watkins did not express his purported intent to preserve the Center's bed authority or the 250-bed license at the time the lease was executed. The lease here was not an arm's length transaction involving a third party, but rather involved a single party, Arthur Watkins, acting both as the lessor and lessee. Under these circumstances, especially the fact that the lease was silent as to this alleged intent, it is significant that Arthur Watkins did not express his intent to C&L in 1978, when C&L acquired Restful Manor from Arthur and Florence Watkins and assumed the lease. Thus, there is no evidence that C&L was ever aware of, let alone shared, Arthur Watkins' intention that the Center be continuously operated as a 250-bed facility. Arthur Watkins expressed this intention for the first time in 1990, when the present

dispute arose. Arthur Watkins' failure to express this intent to subsequent lessees undermines his assertion that he intended the promise to return the "premises" in as good condition as when leased to include the Center's bed authority or the 250-bed license. Further, the historical fact that the Center was continuously maintained as a 250-bed facility for 13 years after the lease was executed is insufficient to create an issue of fact as to the meaning of the lease.

As to the claim that RCC breached its promise not to use the premises for any purpose other than as a nursing home facility, it is uncontroverted that RCC has continuously used the Center for no purpose other than as a nursing home facility.[7]

The 1977 addendum to the lease required RCC to return the Watkins' "personal property . . . presently located *on* the leased premises and used or useful in the conduct of [RCC's] business". (Italics ours.) This provision suggests that the "personal property" referred to is *physical* property. However, even assuming that the term refers to incorporeal property, *i.e.*, a legal right, we conclude that this provision could not apply to a legal right in the Center's continued maintenance as a 250-bed nursing home facility because we have determined that the Watkins do not possess such a right as a matter of law.

The Watkins also assert that RCC breached the provision in the 1975 HUD agreement requiring a lessee to "maintain in full force and effect a license from the state". However, the 1975 HUD agreement plainly states only that the lessee shall maintain *a* license in full force and effect at all times. The agreement does not require that the license provide for the operation of a specific number of beds. Arthur Watkins'

---

[7]Thus, this case is distinguishable from *Lonoke Nursing Home, Inc. v. Wayne & Neil Bennett Family Partnership*, 676 S.W.2d 461 (Ark. Ct. App. 1984). In *Lonoke*, which was discussed earlier, the appellate court upheld an injunction against the lessee-operators of two state-licensed nursing home facilities who sought to discontinue all use of the leased premises as nursing home facilities, thus breaching the lease and destroying the ability of the premises to operate as nursing home facilities. 676 S.W.2d at 462-63.

unilateral, subjective belief, unexpressed to subsequent lessees, that the provision meant that the lessee must continuously maintain the 250-bed license then in effect, does not constitute evidence of the parties' intent. *See Olympia Police Guild*, 60 Wn. App. at 559.

Finally, the Watkins assert that RCC breached the provision of the HUD agreement prohibiting the lessee from "subtracting" from any "personal property" belonging to the insured project. In support of this assertion, the Watkins submitted the statements of HUD officials that HUD regarded the certificate of need and the license each as constituting "a species of personal property belonging to the project." These statements do not evidence the intent of the contracting parties to prohibit the lessee from reducing the number of licensed beds in operation at the Center. The HUD officials do not assert they were even present at the time the 1975 agreement was made.

In sum, the language in the lease and the 1975 HUD agreement, reasonably construed, did not require RCC to preserve the Center's "bed authority" or to maintain a 250-bed license. Accordingly, RCC did not breach the lease or the 1975 HUD agreement when it agreed to reduce the number of nursing home beds in operation at the Center.

D. Attorney Fees.

The Watkins argue that RCC was not entitled to attorney fees under the purchase and sale agreement because their (the Watkins) status as a third party beneficiary of the agreement's guarantor provision did not subject them to the attorney fees provision.[8]

 Under Washington law, a prevailing party may recover attorney fees only if authorized by a private agreement, by statute, or by a recognized ground in equity. *State*

---

[8]The Watkins also contend that they are entitled to attorney fees under the lease. However, because RCC has not defaulted on the lease, the Watkins do not qualify for attorney fees thereunder.

*v. Keeney,* 112 Wn.2d 140, 142, 769 P.2d 295 (1989). Here, the purchase and sale agreement provided that either "party" may recover attorney fees from the other if that party prevails in an action arising out of or relating to the agreement. It would be both unfair and contrary to law to enforce the attorney fees provision negotiated between the Pavloffs and RCC against the Watkins, who were strangers to the agreement.[9] Moreover, the trial court's decision here did not depend on any aspect of the purchase and sale agreement. Rather, the decision required a determination of the Watkins' property rights, if any, arising under the certificate of need and an interpretation of the rights and duties of the parties under the provisions of the lease and the HUD agreement. Hence, the terms of the purchase and sale agreement simply were not central to the dispute here. *See Hemenway v. Miller,* 116 Wn.2d 725, 742-43, 807 P.2d 863 (1991).

The order of partial summary judgment is affirmed. The award of attorney fees in favor of RCC is reversed.

SCHOLFIELD and AGID, JJ., concur.

After modification, further reconsideration denied June 18, 1992.

Review denied at 120 Wn.2d 1007 (1992).

---

[9]RCC cites *Wolfe v. Morgan,* 11 Wn. App. 738, 524 P.2d 927 (1974), as contrary authority. However, the issue raised here, *i.e.,* whether a contract's attorney fees provision can be enforced against a nonsignator, third party beneficiary of another contractual provision, was not squarely addressed by the *Wolfe* court.