[No. 43558. En Banc. February 19, 1976.]

NATIONAL BANK OF WASHINGTON, ET AL, *Respondents*, v. EQUITY INVESTORS, ET AL, *Defendants*, WALTER F. STEPNITZ, ET AL, *Appellants*, TRANSAMERICA TITLE INSURANCE COMPANY, *Respondent*.

*Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle,* by *Robert R. Beezer,* for appellant Stepnitz.

*Bogle & Gates,* by *Dan P. Hungate* and *Michael W. Dundy,* for respondents National Bank of Washington, et al.

WRIGHT, J.—This appeal involves the issues of guarantors' liability; the amount of deficiency that can be charged them under a mortgage foreclosure proceeding; the propriety of granting an upset price in a mortgage foreclosure proceeding and the correctness of denying a motion to consolidate two trials related to the appellants' (guarantors') liability. This appeal follows two former appeals coming before this court; (1) *National Bank v. Equity Investors,* 81 Wn.2d 886, 506 P.2d 20 (1973), and (2) *National Bank v. Equity Investors,* 83 Wn.2d 435, 518 P.2d 1072 (1974). The issues and facts in this current appeal can better be understood if the facts and resolutions of the first two appeals are briefly recited. For purposes of simplicity, the two former appeals will be designated Nos. 1 and 2.

1

*National Bank v. Equity Investors*
81 Wn.2d 886, 506 P.2d 20 (1973)

In 1968 a group of four Boeing Company engineers (G. E. Stein, J. M. Lancaster, L. N. Christian, Joseph F. MacDonald and his wife, Marilynn; hereafter the MacDonald group) owned two parcels of land in south Seattle. The MacDonald group sold these parcels to Equity Investors on December

30, 1968, under a real estate contract. Equity Investors began the process of developing the land into a 220-unit apartment complex. The builder was Brama Construction Company. One of the lumber suppliers was Columbia Wood Products, Inc. The financing institution was the National Bank of Washington (hereafter bank). Financing was to be made on three conditions: (1) The MacDonald group's vendor's interest under the real estate contract would be drafted in the form of a deed of trust (designating the MacDonald group as beneficiary); (2) The MacDonald group's otherwise prior interest would be subordinated to the security interest of the bank; and (3) Equity Investors would supply its interest in the property as security for a $1,850,000 loan from the bank. The bank was to take the security in the form of a first lien deed of trust designating it as beneficiary. The bank procured title insurance insuring the bank's first-lien position in the property. It developed that the agent of the title company preparing the subordination agreement neglected to caution the MacDonald group that the subordination was unconditional. (That omission later became the basis for one of the suits consolidated in the original appeal.) Further, the superior-lien position of the Columbia Wood Products' materialman's lien (found to exist in the second appeal) over the deed of trust held by the bank, has resulted in a separate suit on the title policy by the bank against Transamerica Title Insurance Company (hereafter Transamerica). It is this suit with which the guarantors-appellants are currently trying to consolidate this appeal.

During the course of construction, the bank used its own discretion in disbursing funds for the project. In October 1969, the bank discovered that it was exhausting the money faster than the rate of completion of the project. To rescue its position, the bank acquired guarantors. Later, there was a substitution of guarantors. In the second and final guaranty, the guarantors consisted of the following persons: Richard and Gloria Walsh, Brama Construction Company and Walter and Evelyn Stepnitz.

548

By February 1970, the bank had only $107,000 remaining to complete a project with an estimated $350,000 cost overrun. Some 6 months earlier, Columbia Wood Products filed a claim of lien for materials delivered and unpaid for ($119,672). By February, Columbia Wood Products decided to foreclose on the lien and instituted proceedings. This, plus the inevitability of the cost overrun, prompted the bank to foreclose on the property, joining the guarantors in the foreclosure action. Walter Stepnitz died during the pendency of the action. Approximately 1 week before the date of trial, Stepnitz' estate in Minnesota was given service of process. Walter and Evelyn Stepnitz and Donald O. Julen, general administrator of the estate of Walter Stepnitz, are the guarantors-appellants in this case and will hereafter be designated as appellants or guarantors. In addition to the above actions, the MacDonald group, now realizing the unconditional nature of the subordination agreement they had signed, brought action against Transamerica, the escrow agent, alleging a breach of fiduciary duty and claiming that this breach caused a loss of priority in the foreclosure action to the MacDonald group's damage.

All the above actions were consolidated at trial, with the following resolution: (a) the bank's lien was held superior in priority to the MacDonald group's and Equity Investors' interest in the property; (b) Columbia Wood Products' materialman's lien was held to be junior and inferior to the bank's total secured loan advanced for construction; (c) the guaranty agreement was held unenforceable for the reason that the bank and General Mortgage Investments had negligently administered the loan funds so as to impair the guarantors' security; (d) Transamerica was liable to the MacDonald group for $104,178.12, plus interest, costs and attorneys' fees; (e) the court held that it was without jurisdiction to enter judgment against the estate of Walter F. Stepnitz; and (f) the trial court refused to confirm the highest bid in the amount of $1.88 million submitted by the bank. Rather, the court set an upset price and indicated that it would confirm a bid of approximately $2.247 million

unless the bank would waive its deficiency judgment. In the first appeal to this court, the following reversals were made: first, the bank's interest was made junior to Columbia Wood Products' materialman's lien; second, Transamerica was found to be nonnegligent as a matter of law regarding the drafting of the subordination agreement; third, the guaranty was considered enforceable with in personam jurisdiction over the estate of Walter F. Stepnitz; and fourth, the upset price was affirmed.

2

*National Bank v. Equity Investors*
83 Wn.2d 435, 518 P.2d 1072 (1974)

On remand, the MacDonald group filed a motion with the trial court asking it to enter a judgment giving to the MacDonald group an amount equal to its judgment on foreclosure prior to the judgment claimed by Columbia Wood Products. The MacDonald group submitted that the decision in the first *National Bank v. Equity Investors* case, *supra*, placing Columbia Wood Products ahead of the bank in participating in the foreclosure sale proceeds did not affect the MacDonald group's priority as to Columbia Wood Products. The trial court granted the motion. Columbia Wood Products thereafter made application to this court for a writ of prohibition and stay of proceedings, contending that the distribution of the proceeds by the trial court was contrary to a fair interpretation of the Supreme Court's opinion in the earlier appeal. In response, this court entered a stay order. This court, on the second appeal, ruled in favor of Columbia Wood Products and reestablished Columbia Wood Products' priority over the MacDonald group and the National Bank of Washington. Attorneys' fees were also reduced from $10,000 for each appeal to $5,000. On remand, the upset price was established and the computation of liabilities made. During that stage of the proceedings, the guarantors were found to be liable for deficiency judgment in the amount of $274,075.93, plus interest of $71,935.54. The priorities in foreclosure, up to the

550

position of the bank's loan of $1,850,000, are as follows: first, receiver's expenses amounting to $194,681.10, of which $99,000 consisted of tax expenses paid from money advanced the receiver by the bank at the mortgage sale; second, John Pearson, for work performed in the amount of $4,700.52; third, Columbia Wood Products in the amount of $165,082.24, plus interest; and fourth, National Bank of Washington, $2,089,511.55, plus interest.

The National Bank of Washington moved for entry of judgment against appellants for any loss suffered by them in the foreclosure proceedings. In response, appellants moved for consolidation of this action with the one commenced on May 24, 1974, in King County (Pacific National Bank v. Transamerica Title Ins. Co.). In the Transamerica case, the National Bank of Washington was claiming loss under the policy claims. Since Columbia Wood Products' lien was given priority over Equity Investors' deed of trust in the foreclosure action, the bank claimed that Transamerica must insure it from loss created by Columbia Wood Products' superiority. Initially, the trial court orally granted appellants' motion, reserving any decision on respondents' motion for judgment. Subsequently, the bank's motion for reconsideration of the consolidation issue and for entry of judgment against appellants was granted and a judgment entered accordingly.

## Current Appeal

Appellants and National Bank of Washington petitioned this court for certiorari and jurisdiction was retained for a third appeal. Appellants appealed the dollar amount of the guaranty, claiming that Columbia Wood Products' lien and that portion of the receiver's expenses attributable to the bank's advance for property taxes, should, by the terms of the guaranty agreement, be omitted from liability. National Bank of Washington cross-appealed on the basis that there was not sufficient evidence to establish the upset price of $2,247,500.

## I.
## LIABILITY OF APPELLANTS
### FOR COLUMBIA WOOD PRODUCTS' LIEN

The appellants assert that the unsuspected and unanticipated lien priority of Columbia Wood Products at the foreclosure sale, is tantamount to a mutual mistake of fact which operates as a pro tanto discharge of the total obligation now owed by appellants under the guaranty agreement to the bank. Appellants now assert that they intended to have the full value of the foreclosed property available to assist in discharging the $1,850,000 obligation owed by Equity Investors to National Bank of Washington, for which appellants are now answerable. Appellants face the prospect of having the proceeds diminished in an amount of $170,000, to discharge Columbia Wood Products' lien, before the remaining money becomes available for discharging Equity Investors' (and hence appellants') obligation to the bank. This result, it is claimed, is beyond the contemplation of the parties. Appellants contend that the deed of trust, the negotiable instrument for $1,850,000 and the second guaranty agreement, comprise the total guaranty obligation. It is argued that the recitation in the note and in the guaranty agreement, that the note would be secured by a first lien on the foreclosed property, in an express term of the contract which places a ceiling upon appellants' liability, equal to whatever dollar amount would have been necessary to discharge Equity Investors' obligation had the trust deed actually been in a first-lien position.

 Suretyship is a consensual and contractual relationship and is generally subject to the same rules applicable to simple contract law. *United States Leasing Corp. v. DuPont*, 69 Cal. 2d 275, 444 P.2d 65, 70 Cal. Rptr. 393 (1968); *Western Sur. Co. v. Horrall*, 111 Ariz. 486, 533 P.2d 543 (1975); Restatement of Security § 88 (1941); *Grand Lodge of the Scandinavian Fraternity of America v. United States Fidelity & Guar. Co.*, 2 Wn.2d 561, 98 P.2d 971 (1940); *Cushman v. National Sur. Corp.*, 4 Ariz. App. 24, 417 P.2d 537 (1966); *Pacific County v. Illinois Sur. Co.*, 234 F. 97

(W.D. Wash. 1916); *Title Guar. & Trust Co. v. Murphy*, 52 Wash. 190, 100 P. 315 (1909); *King Equip. Co. v. R.N.&L. Corp.*, 1 Wn. App. 487, 462 P.2d 973 (1969).

In construing what legal obligations are imposed by language of a specific instrument, the objective meaning of the language determines liability. Sureties are bound by what they say rather than by what they secretly intend:

> To say that a surety is held to whatever obligation his words reasonably induce his promisee to believe he intends to assume is merely to state in elementary fashion the objective theory of contracts.

L. Simpson, *Law of Suretyship* 98 (1950).

■ The contract law rule which discharges contractual obligations which were entered into under a mutual mistake of fact also is applicable to suretyship obligations entered into under a mistake of fact. *Fischler v. Nicklin*, 51 Wn.2d 518, 319 P.2d 1098 (1958); *Washington Mach. & Supply Co. v. Zucker*, 19 Wn.2d 377, 143 P.2d 294 (1943); *Sherman v. Western Constr. Co.*, 14 Wn.2d 252, 127 P.2d 673 (1942).

A suretyship agreement may be drafted to include language which imposes the duty to indemnify against loss even if the parties are operating under a mistake of fact. In such an instance, the surety is little more than an absolute insurer against loss. Compensated or commercial sureties are likely to fall within that category in the event there is any ambiguity as to the scope of the risk assumed. *Duke v. National Sur. Co.*, 130 Wash. 276, 227 P. 2, *aff'd*, 131 Wash. 700, 230 P. 102 (1924); *Glaspey v. Drolet*, 6 Wn.2d 610, 108 P.2d 375 (1940); *Tucker v. Brown*, 20 Wn.2d 740, 150 P.2d 604 (1944).

The rules of construction pertaining to suretyship contracts are complicated somewhat by the distinction between compensated sureties and accommodation sureties. The former, in the event there is ambiguity in the language selected, are assumed to have intended the more burdensome interpretation. The latter being the favorites of the law are considered to have attached the least burdensome

meaning to the language. L. Simpson, *Law of Suretyship* 101 (1950) states:

> The compensated surety has never been regarded as a favorite of the law, and the rule of strictissimi juris has no application to his contract either as to interpretation or as to effect. Its promise is generally said to be in the nature of a contract of insurance and the rules applicable to it.

And at page 111:

> The consequence of the attitude toward the compensated surety is that, in determining when the facts subsequent to its promise should operate as a discharge, the scope of the risk assumed is first determined.

In *Ore-Ida Potato Prods., Inc. v. United Pac. Ins. Co.*, 87 Idaho 185, 392 P.2d 191 (1964), it is stated at page 199:

> The undertakings of compensated sureties are regarded as in the nature of insurance contracts and controlled by rules applicable thereto, rather than by rules applied to gratuitous sureties, which, under the doctrine of strictissimi juris, are regarded as favorites of the law. Gruman v. Sam Breedon Construction Co., 148 So.2d 759 (Fla.App.1963); Westinghouse Electric Corp. v. Mill & Elevator Co., 254 Iowa 874, 118 N.W.2d 528 (1962); Crane Supply Company v. American States Insurance Co., 310 F.2d 712 (6th Cir. 1962); Phoenix Assurance Co. of New York v. City of Buckner, Mo., 305 F.2d 54 (8th Cir. 1962); Old Colony Insurance Company v. City of Quitman, 352 S.W.2d 452 (Texas 1962); White v. Brown, 110 U.S.App.D.C. 232, 292 F.2d 725 (1961); Chapman v. Hoage, 296 U.S. 526, 56 S.Ct. 333, 80 L.Ed. 370 (1936); 72 C.J.S. Principal and Surety §§ 124c, d, 189 (1951); 50 Am.Jur., Suretyship, §§ 321, 322 (1944); Restatement of Security, § 129(2) (1941); Annot. 94 A.L.R. 876 (1935).

The general tendency not to allow the compensated surety to avoid liability on some defenses that have otherwise sufficed for the accommodation surety is based on the ability of the compensated surety to protect itself from loss. The compensated surety sells protection as a sort of commodity. It has solicited the sale of its protection for purposes of gain and its business assumes that losses will occur

for which it must pay. The promisor is held to be responsible for any loss occurring in the normal conduct of the debtor's business. Being a professional surety, the promisor's contract will always be preceded by an investigation of the risk, and its charges will be graduated according to the amount of risk involved, with language carefully selected by itself. *See* L. Simpson, *Law of Suretyship* 94 (1950). *See also Northern Pac. Ry. v. Fidelity & Deposit Co.*, 74 Wash. 543, 134 P. 498 (1913); *Great Northern Ry. v. Fidelity & Deposit Co.*, 74 Wash. 698, 134 P. 500 (1913); *Costello v. Bridges*, 81 Wash. 192, 142 P. 687 (1914); *Title Guar. & Trust Co. v. Murphy, supra; Tucker v. Brown, supra; Glaspey v. Drolet, supra; Wenatchee Orchard Syndicate v. Fidelity & Deposit Co.*, 143 Wash. 632, 255 P. 943 (1927); *Duke v. National Sur. Co.*, 130 Wash. 276, 227 P. 2, *aff'd*, 131 Wash. 700, 230 P. 102 (1924).

In the instant case, appellants are neither a pure accommodation surety, nor in the strict sense are they compensated sureties; but rather, they are somewhere in between. The Stepnitzes had an ownership interest in the project and as a business venture, must have considered the risks involved. They were in the venture to make a profit and knew full well that in the business world, and particularly in the construction industry, things such as bad weather, rising material costs, labor disputes, subcontractor defaults, and numerous other contingencies, can turn a money-making venture into a money-losing venture. The bank obviously appreciated the risks too. In drafting the guaranty agreement, the bank included the following language in section 5(d) of the agreement:

> The New Guarantors will hold Interim Lender and the Participant harmless from any and all loss due to advances made under the Note or on account of the Participant's purchase of an interest therein.
> . . . The liability of each of the New Guarantors hereunder shall not be affected or impaired by any failure, neglect or omission to realize upon the Note or the security therefor.

If the appellants are viewed as being in the nature of

compensated sureties, it is clear that the above language, construed most strongly against them, compels the conclusion that they assumed the risk that the collateral could have lost its value entirely, without releasing them from liability.

■ However, in the instant case, we need not adopt a rule of construction weighted against appellants. In this case, the suretyship agreement was drafted by the bank (obligee). L. Simpson, *Law of Suretyship* 94 (1950) states at pages 98-99:

> Where, however, the language of the surety's promise is selected by the obligee, another view is permissible. For example, where an accommodation surety signs a bond, its language is generally selected by others before it is presented to him for signature and doubts should be resolved in his favor. The same is true where the guaranty merely refers to the contract between the principal debtor and the creditor. Under such circumstances, it may be reasonable to ascribe to the surety an intent to assume the least burdensome obligation consistent with his words if such meaning could be understood by an ordinary person under the same or similar circumstances. The obligee's reasonable understanding as to what the surety means when his promise is made under these circumstances must take into account the facts that the obligee has himself selected the ambiguous language and that the surety will understand it to mean the least burdensome obligation for him. Hence, while the words in a formal sense are the language of the surety under these circumstances, they are, in a more real sense, the language of the promisee and, if the promisee's ambiguous language is misleading, he rather than another who has reasonably misunderstood · it should suffer in consequence.

(Footnotes omitted.) Viewing the language in the guaranty agreement most strongly for the appellants still compels the conclusion that they assumed the risk that there could be a "failure, neglect or omission to realize upon . . . the security." The import of that language is clear and there is simply no rule of construction that can ascribe a different meaning to those words.

■ Another aspect of suretyship law, aside from mutual mistake of fact, that could affect the legal relations of the parties in this appeal is the right known as subrogation. If the principal's debt to the creditor is secured by property of the principal, the surety acquires by the operation of law, a kind of property interest in the res that is securing that primary debt. *Inland-Ryerson Constr. Prods. Co. v. Brazier Constr. Co.*, 7 Wn. App. 558, 500 P.2d 1015 (1972). The creditor, in such instances, is under a legal duty to take whatever action is necessary to maintain the value of security. Any diminution of value of the security caused by the creditor, whether by negligence or not, results in pro tanto discharge.

> The reason for the pro tanto discharge of the surety is the impairment of the surety's right of subrogation to enforce the security. The surety's right of subrogation attaches specifically to any security that the creditor obtains in any way as soon as he obtains it. Being an equitable right, it makes no difference that the security was obtained subsequent to the surety's promise and without the knowledge of the surety.

L. Simpson, *Law of Suretyship* 370 (1950).

In *New England Mut. Life Ins. Co. v. Randall*, 42 La. Ann. 260, 265, 7 So. 679, 680 (1890) it is stated:

> When the creditor intends to look to the surety for payment he is compelled to preserve, unimpaired, all his rights against the debtor. If the creditor therefore does any act without the surety's consent, which impairs his rights of subrogation or the means of enforcing his claim against the principal in case he should be called upon to pay the debt, the surety will be discharged.

For this reason, inquiry must be made to determine whether by the operation of law (rather than by terms of the suretyship contract), an erosion in the value of the security pro tanto discharges appellants' obligation to the bank.[1] In an abstract hypothetical sense, the subordinated

---

[1] The language in the suretyship agreement is broad enough only to encompass loss of the value of security by acts or occurrences existing in persons other than the obligee-bank. Under the rules of interpretation above, a clause specifically allowing the obligee to release the

status of the security to Columbia Wood Products' lien was a result of the acts of the creditor. But it was the equities of the situation, rather than the bank's direct act, that prompted us in *National Bank v. Equity Investors*, 81 Wn.2d 886, 506 P.2d 20 (1973) to grant Columbia Wood Products' first-lien position. This court stated in *National Bank* at page 900:

> The rule here contended for by lender would lead to an inevitable unjust enrichment, enabling the lender to withhold or apply the loan money as he saw fit, all the while knowing that putative lien claimants were furnishing valuable materials and doing valuable work to *the enhancement of his security*.

(Italics ours.) If the superior-lien position of Columbia Wood Products was justified against the bank in the basis of "enhancement of his security" that same enhancement of the security now justifies, as against the surety, the surety's obligation to accept the second-lien position of the collateral and discharge their obligation to Equity Investors on that basis. The appellants can succeed only to whatever rights the creditor had in the collateral:

> [E]quity will treat the surety as though he were an assignee of the creditor, standing in his shoes to enforce the debt against the debtor together with any collateral held as security for the debt, entitled to all priorities and immunities enjoyed by the creditor. Against the creditor, the right is strictly equitable, and is simply a right that the creditor assign to the surety his claim against the principal as well as any security held by him. It amounts in reality to specific performance, differing only in the respect that the duty of the creditor, which the court enforces, does not arise from contract, but is imposed upon him by equity, to increase the probability of the surety's obtaining reimbursement.

(Footnotes omitted.) L. Simpson, *Law of Suretyship* 206-07 (1950).

---

security or to negligently diminish its value, would be required before the obligee could raise a defense against pro tanto discharge, by means of an exculpatory clause. *See National Bank v. Equity Investors*, 81 Wn.2d 886, 506 P.2d 20 (1973).

For the above reasons, we hold that appellants are not entitled to pro tanto discharge (to the extent of Columbia Wood Products' lien position) under a theory of mutual mistake of fact, or under a theory of impairment of security.

## II.
### LIABILITY FOR TAXES PAID

Approximately $99,000 in outstanding taxes were owed at the time of the sheriff's sale. The mortgagee-bank advanced the money to the receiver who then paid the taxes. The final report of the receiver states:

> Funds to pay said taxes were advanced to the receiver by the purchasers at the sheriff sale, and to the extent the receiver is entitled to reimbursement from the proceeds of the foreclosure sale for taxes paid as an expense of the receivership, reimbursement should be made directly to the purchasers or their assigns.

■ The great weight of authority is that a mortgagee who pays taxes to protect his interest in mortgaged premises, when the mortgagor is under the duty to pay said taxes, is entitled to be reimbursed for the amount so paid. *Harrison v. Smith*, 98 Wash. 154, 167 P. 89 (1917); *Stallings v. Erwin*, 148 Mont. 227, 419 P.2d 480 (1966); *Law v. Dewoskin*, 223 Tenn. 453, 447 S.W.2d 361 (1969); Annot., 84 A.L.R. 1366 (1939). Two remedies are available in such instance. First, the mortgagee, prior to foreclosure, may bring an independent action to recover the taxes paid, on the theory that one paying taxes owed by another is thereafter subrogated to all rights of the taxing entity. 123 A.L.R. 1248, *supra* at 1256. Second, the mortgagee may, if there are appropriate covenants in the mortgage, wait until foreclosure and by affidavit amend the foreclosure decree to reflect all amounts due, including taxes paid. RCW 61.12.060; *Harrison v. Smith, supra* at 157.

The mortgage in this action contains such a covenant and provides:

> The mortgagor will pay all taxes . . . and in default thereof the mortgagee may pay the same, and the

amount so paid by the mortgagee shall be repaid by the mortgagor to the mortgagee and in default of such repayment, *at the option* of the mortgagee, may be added to the indebtedness and be secured by this mortgage.

(Italics ours.) The mortgagee in paying the taxes of the mortgagor and waiting until after the foreclosure sale to be reimbursed by the receiver, has waived the right to recover taxes. The mortgage and taxes constitute a single obligation. After foreclosure, all claims against the mortgagor are merged in the decree of foreclosure and the judgment taken. The rule is stated in *Stallings v. Erwin, supra* at 229-30:

> The mortgagee, it is held, must combine his tax claims with a suit to foreclose for the mortgage debt. True, he will be allowed to add tax disbursements to the amount of the debt up to the entry of a foreclosure decree, and the courts will be liberal in permitting amendments to that effect. . . . "The general rule may be stated to be that, as the amount paid for taxes, together with the amount due on the mortgage, constitutes but a single and indivisible demand, existing only by virtue of the mortgage, and being collateral and subordinate thereto, it cannot be separated and collected in a separate action; therefore, a mortgagee who has paid taxes on the encumbered property, either before or after the foreclosure of his mortgage, to protect his interest therein, cannot, after the foreclosure of the mortgage, maintain an independent action against the mortgagor to recover the amount so paid, since such payment does not create a lien or liability apart from that of the mortgage, and since a satisfaction of the latter cancels and terminates all liability on the part of the mortgagor to reimburse the mortgagee therefor." 84 A.L.R. 1387, Northern Finance Corp. v. Byrnes, (C.C.A.8th 1925) 5 F.2d 11; San Mateo County Bank v. Dupret, 124 Cal.App. 395, 12 P.2d 669; Gilmour v. First Nat. Bank, 21 Colo.App. 301, 121 P. 767; Sperry v. Butler, 75 Conn. 369, 53 A. 899; Semans v. Harvey, 52 Ind. 331; Dickinson v. White, 64 Iowa 708, 21 N.W. 153; Walton v. Bagley, 47 Mich. 385, 11 N.W. 209; Horrigan v. Wellmuth, 77 Mo. 542.

Accordingly, we hold that the receivership expenses should be reduced by the amount of the mortgagee's tax advance.

Whatever obligation the mortgagor may have had to pay the taxes, that obligation no longer exists because of the failure of the mortgagee to properly preserve that obligation through one of the two remedies mentioned above. The suretyship agreement and the other instruments comprising the total surety obligation are broad enough to include such tax expenses, but only if those expenses were properly preserved throughout this proceeding.

## III.
### PROPRIETY OF UPSETTING MORTGAGEE'S BID OF 1.88 MILLION DOLLARS TO $2,247,500.

Of the evidence presented to the trial court at the March 10 and 24, 1974 hearings, the court considered the following items: (a) the depressed state of the economy in the Puget Sound region; (b) the supply and demand for apartment complex projects; (c) apartment occupancy factors; (d) apartment rent structures; (e) the potential future values of the property; (f) the potential future economy of the community surrounding the property; and (g) the actual cost of land, labor, and materials which have been invested in the completion of the apartment complex. In examining the record, we have found that the total capital outlay on the project, excluding interest, exceeds the upset price fixed by the court. There was no evidence showing that the actual cost of the project would not have exceeded the value of the project were normal market conditions present. The exercise of discretion by the trial court was in accordance with the guidance given in *Lee v. Barnes,* 61 Wn.2d 581, 379 P.2d 362 (1963). We affirm the $2,247,500 price.

## IV.
### PROPRIETY OF NOT CONSOLIDATING APPELLANTS' LIABILITY WITH THE KING COUNTY CASE OF PACIFIC NATIONAL BANK v. TRANSAMERICA TITLE INS. CO.

Consolidation of claims for trial is within the sound discretion of the trial court. *State ex rel. Sperry v.*

*Superior Court*, 41 Wn.2d 670, 251 P.2d 164 (1952). Such decision not to consolidate will be final unless there has been a clear abuse of discretion, and if the moving party can show prejudice. *Hawley v. Mellem*, 66 Wn.2d 765, 405 P.2d 243 (1965); *In re Maypole*, 4 Wn. App. 672, 483 P.2d 878 (1971). Appellants assert that prejudice will result in not consolidating the actions because when the guaranty judgment is paid satisfying Columbia Wood Products' lien, the title insurance company will deny any loss on the part of the bank. The title insurance insuring the first-lien position of Equity Investors' deed of trust constitutes a part of the security between Equity Investors and the bank. Appellants, in answering for the debt of Equity Investors, are subrogated to all rights the creditor bank had in any security pledged, plus any rights the creditor had in collateral instruments affecting the value of that security. We are aware that the policy of title insurance cannot, by its terms, be assigned. Yet appellants, by the operation of law, have become a type of equitable beneficiaries of any proceeds recoverable under that title insurance. Appellants' interest in the subject matter of the litigation would allow them to intervene in the action beween the bank and Transamerica Title Insurance Company. CR 24(a); *Moses Lake Homes, Inc. v. Grant County*, 49 Wn.2d 182, 299 P.2d 840 (1956); *American Discount Corp. v. Saratoga West, Inc.*, 81 Wn.2d 34, 499 P.2d 869 (1972); *Fritz v. Gorton*, 8 Wn. App. 658, 509 P.2d 83 (1973). Their capacity to intervene prevents any prejudice that could have occurred from failure to consolidate the actions. Further, even if appellants chose not to intervene, Transamerica cannot use the Stepnitz' payment of Columbia Wood Products' lien as a defense to liability. That portion of the Stepnitz' payment under the surety contract, representing Columbia Wood Products' judgment, is conditioned upon nonrecovery by the bank against Transamerica. If Transamerica is found to be liable, appellants can recover in an action for restitution any unjust enrichment of the bank that would result

from Transamerica's payment to the bank for the already-compensated loss.

This appeal is reversed in part and remanded with instructions to compute liabilities in accordance with this opinion.

STAFFORD, C.J., FINLEY, HUNTER, HAMILTON, UTTER, and HOROWITZ, JJ., and REVELLE and WEAVER, JJ. Pro Tem., concur.

Petition for rehearing denied April 29, 1976.