[No. 11604-2-III.    Division Three.    July 7, 1994.]

CENTURY 21 PRODUCTS, INC., *Respondent*, v. GLACIER SALES, *Appellant.*

*Timothy J. Carlson, Heidi G. Bolong,* and *Halverson & Applegate, P.S.,* for appellant.

*Diehl R. Rettig* and *Raekes, Rettig, Osborne, Forgette & O'Donnell,* for respondent.

MUNSON, J. — Glacier Sales appeals a judgment of $13,210.09 based on a jury verdict in favor of Century 21 Products, Inc. Glacier argues the trial court erred (1) in submitting the question of the validity of an oral guaranty to the jury; (2) in refusing to give its proposed jury instruction on mitigation of damages; and (3) if the guaranty should be valid, in failing to discharge its obligation because Century 21 impaired its collateral.

The parties to this case are in the processed potato industry. Century 21 is a supplier of raw potatoes. Typically, Cen-

tury 21 purchases potatoes from farmers, washes, sorts, and grades them. The lower grades of potatoes are then sold to potato processors. Sun Russet Potatoes, Inc., was such a potato processor. Sun Russet's primary product was hash browns. Glacier is a dealer in processed potatoes. Glacier would buy from various potato processors and sell to its customers. Although Glacier handles other fruits and vegetables, most of its sales are of frozen processed potatoes. While there was no formal agreement, Sun Russet sold most of its output to Glacier. By custom, most transactions in the industry are conducted by telephone, rather than in writing.

According to George Yoshino, president and principal shareholder of Century 21, Emmett Byrnes, vice president and director of Glacier, telephoned and asked Century 21 to sell potatoes to Sun Russet. Mr. Yoshino declined, stating Sun Russet had a bad credit history and had not paid for purchases from his prior employer. He stated Mr. Byrnes told him Glacier controlled Sun Russet's accounts receivable and would guarantee Century 21 was paid. Century 21 then sold potatoes to Sun Russet. There was no written contract or confirmation of the guaranty.

Mr. Byrnes denied saying Glacier would guarantee Sun Russet's debt to Century 21. He admitted, however, that he may have said Glacier would help Century 21 if there were a problem. Mr. Byrnes testified he had been a director of Sun Russet for most of its operating life. He also stated he loaned money from his pension plan to Sun Russet at a favorable rate.

Sun Russet paid for some of the purchases from Century 21, but owed $13,210.09 when it filed bankruptcy. When Mr. Yoshino learned Sun Russet had filed bankruptcy, he contacted Mr. Byrnes asking Glacier to honor its guaranty. Mr. Byrnes replied Glacier had not guaranteed Sun Russet's debt. Century 21 attempted to recover from Sun Russet's bankruptcy estate, but was unsuccessful. This suit followed, and the jury found Glacier liable for the full amount.

ORAL GUARANTY

Glacier contends the oral guaranty was void and unenforceable under the statute of frauds, RCW 19.36.010. We disagree.

■ The statute of frauds, RCW 19.36.010, requires a contract to be in writing if it is a "special promise to answer for the debt, default, or misdoings of another person . . .". Here, Century 21 admits Glacier's promise to answer for Sun Russet's debt was not in writing. However, courts have held where the "primary purpose" or "leading purpose" of the guaranty is to benefit the guarantor, the promise will be upheld without a writing. See *Morrison-Knudsen Co. v. Hite Crane & Rigging, Inc.*, 36 Wn. App. 860, 863, 678 P.2d 346, *review denied*, 101 Wn.2d 1020 (1984). Primary purpose analysis is often phrased in terms of whether the guaranty was an original promise or a collateral promise. It is an original promise if the primary purpose is to benefit the guarantor. See *Washington Belt & Drive Sys., Inc. v. Active Erectors*, 54 Wn. App. 612, 774 P.2d 1250 (1989), *review denied*, 113 Wn.2d 1035 (1990).

■ Glacier relies on *Seiffert Co. v. Wright*, 108 Wash. 616, 619, 185 P. 577 (1919) for the proposition that whether the leading object exception is met is a question of law. Glacier misconstrues *Seiffert*. The holding in *Seiffert* is clearly limited. "There being no substantial conflict in the testimony, the question . . . is one of law." *Seiffert*, at 619. Here, there was a substantial conflict in testimony; the question was properly submitted to the jury.

The jury's general verdict for Century 21 necessarily implies it found the primary purpose for Glacier's guaranty was Glacier's own benefit. The trial court instructed the jury as follows:

> The plaintiff has the burden of proving the following propositions:
>
> 1. Sun Russet Potato entered into a contract with the plaintiff to purchase potatoes, of which the sum of $13,210.09 remains unpaid;
>
> 2. That the defendant, Glacier Sales, made a promise to pay for the debt owed by Sun Russet Potato; and

3. *That the promise to pay for the debt to the plaintiff was for the leading benefit to Glacier Sales.*

(Italics ours.) Instruction 4. The court further instructed the jury:

An oral promise to guarantee the debt of another is legally binding and enforceable if the leading purpose of the promise is to benefit the person or entity making the promise.

Instruction 6.

■ "In reviewing a jury's finding of fact this court's inquiry is limited to whether that finding is supported by substantial evidence." *Strother v. Capital Bankers Life Ins. Co.*, 68 Wn. App. 224, 234, 842 P.2d 504 (1992), *rev'd on other grounds sub nom. Ellis v. William Penn Life Assur. Co. of Am.*, 124 Wn.2d 1, 873 P.2d 1185 (1994). Substantial evidence exists where the record contains evidence in sufficient quantum to persuade a fair-minded, rational person of the truth of the declared premise. *Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 157, 776 P.2d 676 (1989). Here, there was substantial evidence of a close relationship between Glacier and Sun Russet and that Sun Russet was one of Glacier's significant suppliers. There was testimony that Glacier had entered contracts to sell the hash browns it was to receive from Sun Russet and, if Sun Russet did not supply those hash browns, Glacier would have to purchase hash browns on the open market — at a potentially higher price. The jury was free to infer Glacier's primary purpose in making the guaranty was to ensure itself a supply of hash browns. We will not disturb the jury's finding. The oral guaranty is within the primary purpose exception to the statute of frauds and is valid.

### MITIGATION OF DAMAGES

Glacier argues the trial court erred in rejecting its proposed jury instruction on mitigation of damages. Again, we disagree.

■ A trial court may not give an instruction that is not supported by the evidence. *State v. Benn*, 120 Wn.2d 631, 654, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993).

■ The doctrine of mitigation of damages is inapplicable in this case. Mitigation of damages is concerned with an innocent party's actions *after* a breach of contract has occurred. A party's actions prior to learning of a breach are irrelevant to the doctrine of mitigation of damages. Glacier cites *Snowflake Laundry Co. v. MacDowell*, 52 Wn.2d 662, 674, 328 P.2d 684 (1958) in support of its argument, but that case shows why mitigation of damages is inapplicable here: "The whole concept turns on the idea that a damaged party should pursue a course, *after a breach*, which is designed to assist the party in breach." (Italics ours.)

Glacier contends the relevant breach in this matter is the breach of Sun Russet in failing to pay its debt to Century 21 because that is the breach that triggered Glacier's obligation to pay the debt. Glacier is incorrect. The contract at issue is the guaranty contract between Glacier and Century 21. This contract was not breached until Glacier refused to honor the guaranty. Century 21's actions before that time are irrelevant to mitigation of damages.

Glacier's basis for its mitigation of damages defense is that Century 21 failed to file a Perishable Agricultural Commodities Act, 1930 (PACA), 7 U.S.C. § 499, trust continuation statement within the allowed period after shipping potatoes to Sun Russet. It was not until long after the expiration of the time limit that Century 21 learned Glacier was reneging on its guaranty. Century 21's actions before learning of the breach are irrelevant to mitigation of damages.

Glacier neither complained of nor presented any evidence regarding wrongful actions by Century 21 *following* Glacier's breach of its guaranty. Indeed, the evidence shows Century 21 did all it could after the breach. It filed the required PACA notice, which was determined to be untimely. It filed a claim against Sun Russet's bond, and it filed a claim in Sun Russet's bankruptcy. Unfortunately, Century 21 was unable to recover any moneys through these efforts. The trial court correctly refused to give Glacier's requested instruction on mitigation of damages.

## IMPAIRMENT OF COLLATERAL

Glacier contends, even if the guaranty is valid, it should be discharged because Century 21 impaired collateral securing the obligation. We agree.

■ As noted in *National Bank v. Equity Investors*, 86 Wn.2d 545, 556, 546 P.2d 440 (1976):

> If the principal's debt to the creditor is secured by property of the principal, the surety acquires by the operation of law, a kind of property interest in the res that is securing the primary debt. The creditor, in such instances, is under a legal duty to take whatever action is necessary to maintain the value of security.

(Citation omitted.) Unless required by the suretyship contract, a creditor need not take any affirmative acts to acquire security, but once acquired, the creditor must maintain any security he has.

> While a creditor is not obligated to take any steps to secure possession of any of the property of the principal, *a creditor is not entitled*, without the consent of the surety, *to relinquish any hold which he has actually acquired on the property of the principal*, and which might have been made effectual for payment of the debt.

(Citation omitted. Italics ours.) 74 Am. Jur. 2d *Suretyship* § 87 (1974). Should a creditor impair the collateral, the surety will be discharged to the extent he is harmed by the impairment. *National Bank*, at 556.

Here, there was not a written agreement requiring Century 21 to acquire collateral for the debt. However, in this instance the protection was granted by operation of law. PACA established a trust for the benefit of Century 21 and provides:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . until full payment of the sums owing in connection with such transactions has been received . . ..

7 U.S.C. § 499e(c)(2). The trust begins at the time of sale, but will be lost if the seller does not timely file notice with

both the Department of Agriculture and the purchaser. 7 U.S.C. § 499e(c)(3). This notice is relatively simple and easily filled out; the notice is common in the industry and was well understood by Century 21. However, in this case Century 21 did not timely file the notice.

Because it purchased virtually all of Sun Russet's production, Glacier may have "controlled" Sun Russet's accounts receivable as Century 21 alleges. Century 21 does not argue that it was relying on the accounts receivable themselves as security, and it took no steps to establish a security interest in the accounts. Rather, Century 21 states it relied only on Glacier's guaranty. In any event, Century 21 did not make its demand under the guaranty until after Sun Russet had filed bankruptcy; by that time the accounts receivable were part of the bankruptcy estate and subject to the control of the bankruptcy trustee, not Glacier.

Had the PACA lien continuation notice been filed, the trust would have been preserved, and payment of the debt would have been assured regardless of Sun Russet's bankruptcy. By failing to preserve the trust, Century 21 deprived Glacier of its opportunity to be subrogated to the benefits of the trust. Failure to preserve the trust harmed Glacier to the full extent of the guaranty and results in a complete discharge of Glacier's obligation. While the jury could have found Glacier's guaranty included a waiver of a defense based on impairment of collateral, it was not asked to do so. We decline to make such a factual determination.

Reversed.

SCHULTHEIS, J., concurs.

THOMPSON, C.J. (dissenting) — The majority opinion holds that the Superior Court erred when it denied Glacier's motion to dismiss for impairment of collateral. In my view, the question of impairment is irrelevant because the facts establish an unconditional guaranty of payment by Glacier to Century 21. I therefore respectfully dissent.

An unconditional or absolute guaranty is an agreement to pay the debt of the principal upon maturity without any express limitation set forth in the guaranty. *Joe Heaston Tractor & Implement Co. v. Securities Acceptance Corp.*, 243 F.2d 196 (10th Cir. 1957). "The authorities agree that one who unconditionally guaranties an indebtedness is not released or discharged by virtue of . . . release or impairment of . . . collateral by a secured creditor."[1] *Walter E. Heller & Co. v. Cox*, 343 F. Supp. 519, 526 (S.D.N.Y. 1972), *aff'd*, 486 F.2d 1398 (2d Cir.), *cert. denied*, 414 U.S. 827 (1973). *See also Istituto Mobiliare Italiano, S.p.A. v. Motorola, Inc.*, 689 F. Supp. 812, 817 (N.D. Ill. 1988); *First State Bank, Hickman v. Peterson*, 205 Neb. 814, 816-17, 290 N.W.2d 634, 635 (1980); *McKeesport Nat'l Bank v. Rosenthal*, 355 Pa. Super. 291, 294, 513 A.2d 434, 436 (1986).

In *Heaston Tractor*, the guarantor sold its appliance store to the debtor. To obtain the necessary financing from Securities and Acceptance Corporation, the guarantor "unconditionally guaranteed" the payment of the debtor's accounts, both present and future, owed to the corporation. The corporation made loans to the debtor and took back chattel mortgages, but did not file them. When the debtor defaulted, the guarantor refused to pay, contending it was released from any obligation by the corporation's failure to file the mortgages.

The court in *Heaston Tractor* recognized that if the guaranty contemplates security for the debt will be taken, there exists an implied agreement that the security will be preserved by proper filing or recording. Otherwise, the guarantor is relieved to the extent of the loss sustained. *Heaston Tractor*, at 198-99. However, the foregoing rule has no application if the guaranty is absolute and unconditional. *Heaston Tractor*, at 199. Under the terms of the guaranty at issue there, the corporation had the authority to change the terms of any of the liabilities and to release any collateral thereto. *Heaston Tractor*, at 199. The court concluded at page 200 that the parties intended an unconditional guaranty that upon default

---

[1]Some courts hold the rule is subject to the doctrine of commercial good faith. That is, it will not apply so as to sanction "economic waste and financial hardship". *See, e.g., United States v. Willis*, 593 F.2d 247, 255 (6th Cir. 1979).

the guarantor would pay the liabilities of the debtor. It reasoned at page 200:

> As an integral part of the sale, the Guarantor, by its guaranty, induced the [corporation] to extend floor plan financing to the Debtor and to continue loans which had been assumed by the Debtor on the purchase of the business. Considering the contract as a whole, the purpose for which it was given, together with all the surrounding circumstances existing at the time the guaranty was executed, we think it was the intention of the contracting parties that upon default the Guarantor was unconditionally bound to pay the liabilities of the Debtor as described in the guaranty instrument.

Similarly, in *United States v. Shirman*, 41 F.R.D. 368, 372 (N.D. Ill. 1966), the guarantors charged that the Small Business Administration had allowed collateral to be dissipated and failed to create and record liens on assets. The court held at page 372 that regardless of the merits of these charges, they were "not germane to the issue of . . . liability under the guaranty" because the guaranty was absolute and unconditional. Specifically, the guarantors had given the bank the "full power" "to deal in any manner with . . . the collateral", including releasing all or any part of it. (Italics omitted.) *Shirman*, at 372.

Here, Glacier's guaranty was oral, as opposed to the written guaranties at issue in the cited cases. Nevertheless, the evidence is sufficient to support the conclusion that Glacier's guaranty was for payment upon Sun Russet's default. The guaranty did not contemplate Century 21 having a PACA trust or other collateral to secure payment of any debt Sun Russet might owe it. To the contrary, the facts are that the parties contemplated Glacier would pay Century 21 out of the accounts it owed Sun Russet — accounts which Mr. Byrnes specifically mentioned when he assured Mr. Yoshino that Glacier would see that Century 21 was paid.[2]

---

[2]Mr. Byrnes testified on cross examination that during the course of an average year, Glacier held about $3.5 million in Sun Russet receivables. Potatoes from Sun Russet constituted about 13 percent of Glacier's yearly business. It handled essentially all of Sun Russet's product. Mr. Byrnes had served on Sun Russet's board during most of its existence. He had resigned only a few months before he contacted Mr. Yoshino with his request that Century 21 sell to Sun Russet.

Other circumstances surrounding the giving of the guaranty also point to its unconditional nature. Mr. Byrnes was the one who requested Century 21 sell to Sun Russet; Mr. Yoshino did not seek out Glacier. In fact, he had no intention of selling to Sun Russet until Mr. Byrnes contacted him. Mr. Yoshino testified he told Mr. Byrnes he had dealt with Sun Russet in the past and found it to be unreliable. Presumably, PACA trusts were available in those prior dealings, but did not provide sufficient incentive for Mr. Yoshino to continue doing business with Sun Russet. The incentive was provided by Mr. Byrnes' guaranty of payment. He told Mr. Yoshino "we hold the accounts payable for Sun Russet, and . . . we will guarantee that you are paid, if you'll sell to them". On the strength of this promise, Century 21 began shipments to Sun Russet, sending copies of all its invoices to Glacier. Mr. Byrnes was the first person Mr. Yoshino turned to when the invoices were overdue. Mr. Byrnes told him he would talk to Sun Russet about its accounts payable. Soon thereafter, Sun Russet filed for bankruptcy.

To paraphrase *Heaston Tractor*, when Glacier's guaranty is considered in light of the purpose for which it was given, together with all the surrounding circumstances existing at the time, it is clear that it was not dependent upon Century 21 continuing any PACA trust it might obtain in potatoes it sold to Sun Russet. As previously noted herein, Mr. Byrnes' guaranty posed no risk to Glacier, given the fact each year it controlled millions in Sun Russet receivables. Since Glacier controlled the purse strings and actually had initial control of Sun Russet funds, it is in no position to complain that Century 21's failure to continue a PACA trust should release it from its guaranty.

Finally, I do not quarrel with the majority's statement of the law. Rather, my disagreement is with its application to these facts. The purpose of the discharge rule is to protect the guarantor's subrogation rights. That purpose is not served by discharging Glacier because Century 21 failed to continue a PACA trust, against which Glacier never intended to exercise its right of subrogation.

I would affirm the judgment in favor of Century 21.

Review granted at 125 Wn. 2d 1014 (1995).