[No. 62053-9.   En Banc.]
Argued May 16, 1995.      Decided June 20, 1996.

CENTURY 21 PRODUCTS, INC., *Petitioner*, v. GLACIER SALES, *Respondent*.

*Rettig, Osborne, Forgette, O'Donnell & Iller*, by *Diehl R. Rettig*, for petitioner.

*Halverson & Applegate, P.S.*, by *Timothy J. Carlson*; and *Heidi G. Bolong*, for respondent.

DURHAM, C.J. — The central issue in this case is whether impairment of collateral releases a guarantor from its obligations under an unconditional guaranty agreement. A jury determined Respondent Glacier Sales had guaranteed Petitioner Century 21 Products payment for the sale of potatoes, and thus awarded Century 21 $13,210.09. Glacier Sales appealed, arguing that Century 21 had impaired the collateral by failing to preserve a lien for payment of the potatoes pursuant to the Perishable Agricultural Commodities Act, 1930, 7 U.S.C. § 499a (1994) (PACA). The Court of Appeals reversed on this basis, holding that impairment of collateral discharges a guaranty

agreement. We agree that a creditor's impairment of collateral generally releases a guarantor from its obligations. Nonetheless, we adhere to the principle that where a guaranty is absolute and unconditional, impairment of collateral has no affect on the agreement. Since the parties in this case have stipulated that their guaranty agreement was unconditional, we reverse the Court of Appeals and reinstate the jury award.

## FACTS

Petitioner Century 21 Products purchases potatoes from farmers, selling its lower grade potatoes to potato processors. These companies, in turn, use the potatoes to make hash browns and other processed foods. Respondent Glacier Sales buys processed potatoes from these companies, selling them to its retail customers.

In December 1988, the president of Century 21, George Yoshino, received a telephone call from Emmett Byrnes, vice president and director of Glacier Sales. Byrnes requested that Century 21 supply low grade potatoes to Sun Russett Potatoes, Inc., a processor of hash brown potatoes. Although no written agreement existed between Glacier Sales and Sun Russett, it appears that Glacier Sales was the primary dealer for Sun Russett's production.

Sun Russett had a history of not paying its debts. Because of this, Yoshino told Byrnes that he would not conduct any business with them. In response, Byrnes stated that Glacier Sales would guarantee Century 21's contract with Sun Russett. Byrnes explained that Glacier Sales held Sun Russett's accounts receivables and thus could make this guaranty. Yoshino had known the president of Glacier Sales for 35 years, and in light of this guaranty, agreed to supply Sun Russett with potatoes. This agreement was reached over the telephone, and as is the practice in this industry, never confirmed in writing.

Glacier Sales had a close relationship with Sun Russett.

Byrnes testified on cross examination that during the course of an average year, Glacier Sales held about $3.5 million in Sun Russett receivables. From the inception of Sun Russett, and until approximately a year before its bankruptcy, Byrnes served on Sun Russett's board of directors. While on the board, Byrnes advised Sun Russett on marketing issues and loaned Sun Russett $35,000 from his pension plan at a favorable rate. Byrnes resigned from the board in 1988 because he disagreed with its business practices and feared becoming financially responsible. This resignation occurred a few months before Glacier Sales offered to guarantee Century 21's contract with Sun Russett.

Based on its guaranty from Glacier Sales, Century 21 provided Sun Russett with seven shipments of potatoes between January and April 1989. During this time, Byrnes and Sun Russett's owner met with Yoshino to request additional quantities of raw potatoes. Century 21 mailed seven invoices to Sun Russett and Sun Russett paid four in full. At some point, Century 21 began sending copies of these invoices to Glacier Sales, but received no response.

Century 21 could have preserved a lien for the payment of the potatoes in the event of Sun Russett's bankruptcy under PACA. A PACA lien gives a produce seller priority over secured creditors when a produce buyer declares bankruptcy. Although Yoshino was familiar with PACA, he believed he could count on his guaranty from Glacier Sales and thus did not file for the PACA lien within the appropriate time frame.

Despite paying for some of the potatoes, Sun Russett filed for bankruptcy owing Century 21 $13,210.09. When Century 21 learned of this, it asked Glacier Sales to honor its guaranty, but Glacier Sales refused to acknowledge one existed. Yoshino immediately filed for a PACA lien, but knew it was untimely. Indeed, the claim was rejected for this reason. Without the PACA lien, Century 21 was unable to recover from Sun Russett's bankruptcy estate because secured creditors' claims depleted the bankruptcy

funds. Subsequently, Century 21 brought suit against Glacier Sales. A jury found a guaranty contract existed between Glacier Sales and Century 21, and awarded Century 21 $13,210.09.

Glacier Sales appealed, arguing, inter alia, that its obligation under the guaranty contract should have been discharged because Century 21 had impaired the collateral by failing to timely file for a continuation of the PACA lien. In a split opinion, the Court of Appeals agreed, holding that under the common law of suretyship, a guaranty contract is discharged if the creditor impairs the collateral. In his dissent, Chief Judge Thompson argued that discharge for impairment of collateral is inappropriate where a guaranty contract is unconditional. *Century 21 Prods., Inc. v. Glacier Sales*, 74 Wn. App. 793, 875 P.2d 1238 (1994), *review granted*, 125 Wn.2d 1014 (1995).

We granted review on the issue of whether Century 21's failure to file for a PACA lien discharged Glacier Sales from the guaranty agreement. Since it was unclear from the record whether the guaranty agreement between Glacier Sales and Century 21 was unconditional, we ordered further factfinding following oral argument. In response, the parties stipulated that they "did not discuss or agree to any conditions." Stipulation of the Parties Regarding Facts at 2. As a result, we consider the agreement between Glacier Sales and Century 21 unconditional.

## ANALYSIS

Glacier Sales contends it should be discharged from the guaranty agreement because Century 21 impaired the collateral by failing to preserve a lien against Sun Russett's assets pursuant to PACA. PACA was conceived to protect farmers and growers from "the sharp practices of financially irresponsible and unscrupulous brokers in perishable commodities.' " *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 780 (8th Cir. 1991) (quoting *Chidsey v. Guerin*, 443 F.2d 584, 587 (6th Cir. 1971)). Prior to an amendment

in 1984, however, produce buyers continued to grant lending institutions security interests in their accounts receivables, while sellers of fresh produce remained unsecured creditors. In response to the precarious situation of produce sellers like Century 21, Congress amended PACA. Pub. L. No. 98–273, 98 Stat. 165 (1984). As amended, PACA provides:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, *shall be held . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities . . .* until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers . . . .

7 U.S.C. § 499e(c)(2) (1994) (emphasis added). Under this provision, sellers of fresh produce have priority over secured creditors when receiving compensation from produce buyers. *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y 1993); *In re Lombardo Fruit & Produce Co.*, 12 F.3d 806, 808 (8th Cir. 1993). Thus, a PACA lien acts as collateral. However, the produce seller "shall lose the benefits of the [PACA] trust" unless he or she provides the Department of Agriculture and the produce buyer with written "notice of intent to preserve the benefits of the trust." 7 U.S.C. § 499e(c)(3) (1994). The seller must provide the notice within the time frame provided by statute and regulation.[1] 7 U.S.C. § 499e(c)(3) (1994); 7 C.F.R. § 46.2(aa)(5) (1996).

It is undisputed that Century 21 filed an untimely notice of its intent to preserve its lien against the property of Sun Russett. If Century 21 had filed this notice promptly, it would have had priority over secured creditors when Sun Russett declared bankruptcy. Glacier Sales

---

[1]In general, the produce seller has 40 days from the time the produce buyer receives the goods to submit the notice. 7 U.S.C. § 499e(c)(3) (1994); 7 C.F.R. § 46.2(aa)(5) (1996).

maintains, and Century 21 does not dispute, that Sun Russett's bankruptcy estate would have paid Century 21 in full if it had filed this notice. According to Glacier Sales, the failure to file the notice discharged it from the guaranty agreement. We turn now to that argument.

In order to enforce a guarantor's obligation, a creditor generally must not impair the collateral. In other words, if collateral is provided, the creditor cannot diminish or sacrifice it and then demand that a guarantor meet its obligation to the creditor. *National Bank of Wash. v. Equity Investors*, 86 Wn.2d 545, 556, 546 P.2d 440 (1976). The defense of impairment of collateral is based on equitable considerations and promotes a guarantor's right of subrogation: a guarantor has the right to step into the shoes of the creditor and sue the debtor for collateral securing the debt. If the creditor has impaired this collateral, then the guarantor is denied the right of subrogation. By impairing the collateral, a creditor prevents a guarantor from suing the debtor to recover the collateral. *Id.*

The creditor's duty to protect the collateral from impairment has been the subject of many treatises.

> While a creditor is not obliged to take any steps to secure possession of any of the property of the principal, a creditor is not entitled, without the consent of the surety,[2] to relinquish any hold which he has actually acquired on the property of the principal, and which might have been made effectual for the payment of the debt.

74 Am. Jur. 2d *Suretyship* § 87 (1974) (footnote omitted); *see also* 38 Am. Jur. 2d *Guaranty* § 84 (1968); 38 C.J.S. *Guaranty* § 81 (1943).

We have recognized that "there are no Washington cases providing that failure to perfect or maintain perfection in a security interest is an impairment of collateral,"

---

[2] The distinctions between the terms surety and guarantor are not relevant in the present context and are used interchangeably. *See* 38 Am. Jur. 2d *Guaranty* § 14 (1968).

and have never discharged a guaranty contract based on this defense. *Hemenway v. Miller*, 116 Wn.2d 725, 732, 807 P.2d 863 (1991). In *National Bank of Wash.*, 86 Wn.2d 545, however, this court took the view that "[a]ny diminution of value of the security caused by the creditor, whether by negligence or not, results in pro tanto discharge." *Equity Investors*, 86 Wn.2d at 556 (citing LAURENCE P. SIMPSON, LAW OF SURETYSHIP 370 (1950)). Although the court advanced a broad rule, it did not discharge the guaranty contract in *Equity Investors* because there was a written agreement between the parties stating that impairment of the collateral "by any failure, neglect, or omission" would not release the guarantor from its obligation. *Equity Investors*, 86 Wn.2d at 554.

■ While impairment of collateral generally releases a guarantor from its obligations under a guaranty agreement, this rule does not apply where the guaranty is unconditional. "The authorities agree that one who unconditionally guaranties an indebtedness is not released or discharged by virtue of . . . release or impairment of . . . collateral by a secured creditor." *Walter E. Heller & Co. v. Cox*, 343 F. Supp. 519, 526 (S.D.N.Y. 1972), *aff'd*, 486 F.2d 1398 (2d Cir.), *cert. denied*, 414 U.S. 827 (1973). *See also Joe Heaston Tractor & Implement Co. v. Securities Acceptance Corp.*, 243 F.2d 196 (10th Cir. 1957); *Instituto Mobiliare Italiano, S.p.A. v. Motorola, Inc.*, 689 F. Supp. 812, 817 (N.D. Ill. 1988); *First State Bank v. Peterson*, 205 Neb. 814, 816–17, 290 N.W.2d 634, 635 (1980); *McKeesport Nat'l Bank v. Rosenthal*, 355 Pa. Super. 291, 294, 513 A.2d 434, 436 (1986); *United States v. Shirman*, 41 F.R.D. 368, 373 (N.D. Ill. 1966). If the guarantor is under an absolute and unconditional obligation, as opposed to a conditional obligation, the guarantor "cannot defend on the ground that the creditor, through negligence or lack of due diligence, lost or dissipated the collateral furnished by the debtor." 38 Am. Jur. 2d *Guaranty* § 84 (1968) (footnote omitted).

The Tenth Circuit, in holding that an unconditional

guarantor was not discharged from its obligations, explained:

> An unconditional guaranty is one whereby the guarantor agrees to pay or perform a contract upon default of the principal without limitation. It is an absolute undertaking to pay a debt at maturity or perform an agreement if the principal does not pay or perform.

*Joe Heaston*, 243 F.2d at 199 (citing 38 C.J.S. *Guaranty* § 7 (1943); 24 Am. Jur. *Guaranty* § 16; 18A Words & Phrases, *Guaranty* 661; 1 Words & Phrases, *Absolute Guaranty* 146). The court continued:

> "Contracts of guaranty are divided into two kinds. One is absolute or unconditional and the other is conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principal without notice. A conditional guaranty is an undertaking to pay or perform if payment or performance cannot be obtained from the principal obligor by reasonable diligence . . . [citing cases] An absolute guaranty, unlike a conditional one, casts no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor . . . . [citing cases]

*Joe Heaston*, 243 F.2d at 200 (quoting *Pavlantos v. Garoufalis*, 89 F.2d 203, 206 (1937)).

The Superior Court of Pennsylvania in *McKeesport Nat'l Bank*, 513 A.2d at 436, reached a similar conclusion. In that case, the president and secretary-treasurer of a closely held corporation personally guaranteed a line of credit that the bank extended to the corporation. The corporation subsequently defaulted and the bank sought recovery. In their defense, the president and secretary-treasurer argued "that the bank had not been diligent in collecting the accounts receivable which had been assigned as security for the loan." *McKeesport Nat'l Bank*, 513 A.2d at 435.

The court acknowledged that a creditor generally has a duty to refrain from impairing the collateral used to secure a debt. Nonetheless, it stated that "where the guaranty is absolute and unconditional *and does not require the creditor to take any action to preserve the security,* the creditor's failure to do so will not relieve the surety's obligation to pay upon default." *McKeesport Nat'l Bank,* 513 A.2d at 436 (emphasis added). Because the guaranty was unconditional "and did not depend upon an inability to realize satisfaction from the collateral," the court rejected the defense that the creditor failed to preserve the collateral. *McKeesport Nat'l Bank,* 513 A.2d at 437. In the present case, the parties stipulated that the guaranty contract was unconditional. Moreover, there is no evidence whatsoever that Glacier Sales required Century 21 to preserve a PACA lien as collateral.

■■ Since the defense of impairment of collateral is based on equity, it is also necessary to evaluate the unique circumstances of each case, particularly the relationship between the guarantor and the creditor, before discharging a guaranty for impairment of collateral. The circumstances surrounding the guaranty contract in this case make its discharge clearly inequitable. Glacier Sales asked Century 21 to provide produce to Sun Russett; Century 21 did not initiate the arrangement. In fact, Century 21 initially refused to do any business with Sun Russett because it was aware of its poor credit history. Century 21 acquiesced only after Glacier Sales offered a guaranty. The purpose of the guaranty was to ensure that Sun Russett had enough potatoes to produce hash browns for Glacier Sales' contracts with retailers. At no point did Century 21 offer the PACA lien or other collateral to secure payment of any debt Sun Russett might owe.

Moreover, it is contrary to the purpose of PACA to discharge a guarantor's obligations when a produce seller does not preserve a trust under PACA. PACA is a response to a congressional determination that financing arrangements between produce sellers and brokers caused a

burden on commerce. The purpose of PACA is to protect produce sellers from unscrupulous dealers in agricultural commodities. 7 U.S.C. § 499e(c)(1) (1994). In this case a dealer, Glacier Sales, is using PACA to discharge a guaranty. This is inimical to the very purpose of PACA.

We hold that Century 21's failure to file a PACA lien does not release Glacier Sales from its obligations under the guaranty agreement. Accordingly, we reverse the Court of Appeals and reinstate the jury award.

DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, ALEXANDER, and TALMADGE, JJ., concur.